# MOTES *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ALABAMA.

No. 257.   Submitted April 23, 1900. — Decided May 21, 1900.

By the Revised Statutes of the United States it is provided: "§ 5508. If two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office or place of honor, profit or trust created by the Constitution or laws of the United States.   § 5509. If in the act of violating any provision in either of the two preceding sections, any other felony or misdemeanor be committed, the offender shall be punished for the same with such punishment as is attached to such felony or misdemeanor by the laws of the State in which the offence is committed." Several persons were indicted under the above provisions in the Circuit Court of the United States for the Northern District of Alabama for the crime of murder committed in execution of a conspiracy to injure, oppress, threaten and intimidate one Thompson because of his having informed the United States authorities of violations by the conspirators of the laws of the United States relating to distilling.   In Alabama murder in the first degree is punishable by death or imprisonment for life at the discretion of the jury.   At the preliminary trial before a United States commissioner, Taylor, one of the accused, testified and his evidence was put in writing and signed by him.   It was sufficient, if accepted, to estab-

Opinion of the Court.

lish the guilt of all the defendants. The accused had opportunity to cross-examine him. At the final trial in the Circuit Court, Taylor, who had pleaded guilty, was called as a witness for the Government, but did not respond. He had disappeared, although seen in the corridor of the court-building about an hour before being called. His absence was not by the procurement or advice of the accused, but was due to the negligence of the officers of the Government. The court, over the objections of the accused, allowed Taylor's written statements made under oath at the examining trial to be read in evidence to the trial jury. The accused were found guilty as charged in the indictment and sentenced to the penitentiary for life. At the trial one of the accused testified and stated that he and Taylor committed the murder; and that the other defendants knew nothing of it and had nothing to do with it. *Held :*

(1) That no constitutional objection could be urged against sections 5508 and 5509;

(2) That under the act of January 15, 1897, c. 29, 29 Stat. 487, the Circuit Court could not have imposed the penalty of death for the offence charged, but only imprisonment for life;

(3) That under the Circuit Court of Appeals Act, 1891, any criminal case involving the construction or application of the Constitution of the United States, can be brought after final judgment directly to this court from the Circuit Court;

(4) That the admission as evidence of the written statements made by Taylor at the examining trial was in violation of the rights of the accused under the clause of the Sixth Amendment to the Constitution of the United States declaring that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witness against him;

(5) That the defendant who testified under oath as to his guilt, and whose testimony was sufficient to convict him, independently of Taylor's written statement at the examining trial was not entitled to a reversal for the error committed in allowing that statement to be read, because it could not have prejudiced him.

THE case is stated in the opinion of the court.

*Mr. Lee Cowart* for plaintiff in error.

*Mr. Assistant Attorney General Boyd* for the United States.

MR. JUSTICE HARLAN delivered the opinion of the court.

Columbus Winchester Motes, alias Chess Motes, Walter W. Motes, William Robert Taylor, Jasper Robinson, John Little-

john and Mark Grant Blankenship were indicted in the Circuit Court of the United States for the Southern Division of the Northern District of Alabama under sections 5508 and 5509 of the Revised Statutes of the United States.

Those sections are as follows:

"5508. If two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office or place of honor, profit, or trust created by the Constitution or laws of the United States.

"§ 5509. If in the act of violating any provision in either of the two preceding sections, any other felony or misdemeanor be committed, the offender shall be punished for the same with such punishment as is attached to such felony or misdemeanor by the laws of the State in which the offence is committed."

The first count of the indictment charged in substance that on the 14th day of March, 1898, and within the jurisdiction of the court, the persons above named conspired to injure, oppress, threaten and intimidate one W. A. Thompson, a citizen of the United States, in the free exercise and enjoyment of a right and privilege secured to him by the Constitution and laws of the United States and because of his having exercised the same, in that he had about the 2d day of October, 1897, informed one Robert A. Moseley, United States commissioner for the Northern District of Alabama, that Bob Taylor, Chess Motes, Ben Morris, Jasper Robinson and Walter Motes had about the months of July, August, September, October, November and December, 1895, violated the internal revenue laws of the United States by unlawfully carrying on the business of distillers without having given bond, as required by law, and having in their possession and custody and under their control

a still and distilling apparatus set up without having the same registered. It was also charged that in furtherance of the conspiracy so formed and to effect the object thereof the accused "did on, to wit, about the 14th of March, eighteen hundred and ninety-eight, go upon the highway and did then and there, in the county of Talladega, in the State of Alabama, in the southern division of the Northern District of Alabama, and within the jurisdiction of said court, unlawfully, wilfully, premeditatedly, deliberately and with malice aforethought kill and murder the said W. A. Thompson by shooting him with a gun or guns, because he, the said W. A. Thompson, had reported to the said Robert A. Moseley, United States Commissioner as aforesaid, said violation of the internal revenue laws of the United States by the said Bob Taylor, Chess Motes, Ben Morris, Jasper Robinson and Walter Motes, as aforesaid, contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America."

The third count differed from the first one only in charging a conspiracy, formed by the same persons, to injure, oppress, threaten and intimidate Thompson because of his having, about March 8, 1898, informed a deputy collector of internal revenue that Mark Grant Blankenship had, about the above date, carried on the business of distiller in violation of law; also, that to effect the object of that conspiracy, and because of Thompson having given such information to the deputy collector of internal revenue, that the accused had unlawfully, wilfully, premeditately, deliberately and with malice aforethought, killed and murdered him.

There are seven counts in the indictment, but the first and third are sufficient to show the nature of the charges against the accused and to bring out the questions disposed of by this opinion.

It is recited in the bill of exceptions that Taylor pleaded guilty, but the transcript does not contain any entry of record showing such to be the fact.

The jury found the "defendants Walter W. Motes, Columbus W. Motes, Jasper Robinson, John Littlejohn and Mark Grant Blankenship guilty as charged in the indictment," and

in their verdict asked "the mercy of the court for the four de-
fendants, Walter W. Motes, Jasper Robinson, John Littlejohn,
Mark Blankenship, and especially for John Littlejohn and Jas-
per Robinson."

Motions in arrest of judgment and for new trial were over-
ruled, and judgment was entered upon the verdict, sentencing
the defendants other than Taylor to imprisonment in the peni-
tentiary for life.

We have seen that by section 5508 of the Revised Statutes
it is made an offence against the United States for two or more
persons to conspire to injure, oppress, threaten or intimidate
any citizen in the free exercise or enjoyment of any right or
privilege secured to him by the Constitution or laws of the
United States—the punishment prescribed being a fine of not
more than $5000, imprisonment not more than ten years and
ineligibility to any office or place of honor, profit or trust cre-
ated by the Constitution or laws of the United States. And by
section 5509 it is provided that if in committing the above of-
fence any other felony or misdemeanor be committed, the of-
fender shall suffer such punishment as is attached to such felony
or misdemeanor by the laws of the State in which the offence
is committed.

No question has been made—indeed none could successfully
be made—as to the constitutionality of these statutory pro-
visions. *Ex parte Yarborough*, 110 U. S. 651; *United States v.
Waddell*, 112 U. S. 76. Referring to those provisions and to
the clause of the Constitution giving Congress authority to pass
all laws necessary and proper for carrying into execution the
powers specifically granted to it, and all other powers vested
in the Government of the United States, or in any department
or officer thereof, this court has said: "In the exercise of this
general power of legislation, Congress may use any means, ap-
pearing to it most eligible and appropriate, which are adapted
to the end to be accomplished, and are consistent with the letter
and the spirit of the Constitution." *Logan v. United States*, 144
U. S. 263, 283, and authorities there cited. It was the right
and privilege of Thompson, in return for the protection he en-
joyed under the Constitution and laws of the United States, to

aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws. That right and privilege may properly be said to be secured by the Constitution and laws of the United States. And it was competent for Congress to declare a conspiracy to injure, oppress, threaten or intimidate a citizen because of the exercise by him of such right or privilege to be an offence against the United States.

The reference in the above sections to the laws of the State in which the offence was committed makes it necessary to ascertain from the laws of Alabama what punishment could be inflicted for the crime that was committed while the conspiracy referred to in section 5508 was being carried into execution.

By the Code of Alabama it is provided (c. 158): "§ 4854. Every homicide, perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing ; or committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery or burglary, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed ; or perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree ; and every other homicide, committed under such circumstances as would have constituted murder at common law, is murder in the second degree." "§ 4857. When the jury find the defendant guilty under an indictment for murder, they must ascertain, by their verdict, whether it is murder in the first or second degree ; but if the defendant on arraignment confesses his guilt, the court must proceed to determine the degree of the crime, by the verdict of a jury, upon an examination of the testimony, and pass sentence accordingly. § 4858. Any person, who is guilty of murder in the first degree, must, on conviction, suffer death or imprisonment in the penitentiary for life, at the discretion of the jury ; and any person who is guilty of murder in the second degree must, on conviction, be imprisoned in the

penitentiary for not less than ten years, at the discretion of the jury." Alabama Code (1896), vol. 2, Criminal.

Taking these statutory provisions together, the question arises whether the court below had authority, in view of the verdict of the jury—"guilty as charged in the indictment"— to sentence the accused to imprisonment in the penitentiary for life. The contention of the accused is that it was for the jury to indicate by their verdict the punishment to be imposed by the court, and that the court was without power to act until the jury indicated the degree of the crime committed.

It is true that the crime charged against the accused was what is made by the laws of Alabama murder in the first degree, such offence being punishable with death or imprisonment in the penitentiary for life. And in that State it is the duty of the jury to ascertain by their verdict whether the offence charged was murder in the first or second degree. As therefore under the laws of Alabama, it was in the discretion of the jury, and not for the court, to say whether murder in the first degree should be punished by death or by imprisonment for life, and as the verdict of the jury did not indicate the mode of punishment, there would have been some difficulty in giving effect to that clause of section 5509 of the Revised Statutes of the United States, subjecting the accused to such punishment as is attached by the laws of the State in which the offence is committed, but for recent legislation by Congress.

The legislation to which we refer is found in sections one, two and three of the act of January 15, 1897, c. 29, which provides: "§ 1. That in all cases where the accused is found guilty of the crime of murder or of rape under sections 5339 or 5345, Revised Statutes, the jury may qualify their verdict by adding thereto 'without capital punishment;' and whenever the jury shall return a verdict qualified as aforesaid the person convicted shall be sentenced to imprisonment at hard labor for life. § 2. That except offences mentioned in sections 5332, 1342, 1624, 5339 and 5345, Revised Statutes, when a person is convicted of any offence to which the punishment of death is now specifically affixed by the laws of the United States, he shall be sentenced to imprisonment at hard labor for life, and when any person is

convicted of an offence to which the punishment of death, or a lesser punishment, in the discretion of the court, is affixed, the maximum punishment shall be imprisonment at hard labor for life. § 3. That the punishment of death prescribed for any offence specified by the statutes of the United States, except in sections 5332, 1342, 1624, 5339 and 5345, Revised Statutes, is hereby abolished, and all laws and parts of laws inconsistent with this act are hereby repealed." 29 Stat. 487.

It will be observed that by section 3 of this act (which is the latest statute on the subject) the death penalty is abolished in all cases of offences against the United States except those referred to in certain sections which do not embrace the present case. It was not therefore in the power of the court below to have sentenced the plaintiffs in error to suffer death for the crime of murder committed in the prosecution of the conspiracy which is made by section 5908 an offence against the United States. But we are to determine the scope of section 5509 in connection with the act of 1897. Under that act the punishment of death could not be inflicted except in the cases specified. So that section 5509 is to be enforced as if it declared that the offence therein prescribed should be punished in such mode as was consistent with the laws of Alabama, provided—such is the effect of the act of Congress of January 15, 1897—the accused should not for any offence covered by that section be subjected to the penalty of death. The provision in the Code of Alabama giving the jury discretion to affix the punishment of death or imprisonment for life in cases of murder in the first degree can have no application here, because the act of 1897 forbade the former mode of punishment in such a case as the present one. When, therefore, the jury found the defendants guilty as charged in the indictment, they found them guilty of what, under the laws of Alabama, was murder in the first degree, and they were sentenced by the Circuit Court of the United States to suffer imprisonment for life which those laws authorized in cases of that character. This was a substantial compliance with the provisions of sections 5508 and 5509 of the Revised Statutes.

It results that the Circuit Court imposed the only punishment

authorized by the laws of the United States for the crime of
which the defendants were found guilty.

To avoid misapprehension it should be said in this connection
that the Circuit Court had no jurisdiction of this case simply as
one of murder committed within the limits of the State, but
only as one of conspiracy, under the act of Congress, accom-
panied by murder.

. The Assistant Attorney General suggests as worthy of con-
sideration whether, under this interpretation of the statutes,
the present case can be brought here directly from the Circuit
Court. This suggestion is based upon the provision in the act
of January 20, 1897, c. 68, which withdraws from the consid-
eration of this court, upon appeal or writ of error direct from
the Circuit Court, cases of conviction of infamous crimes not
capital, and gives jurisdiction in such cases, upon appeal or writ
of error, only to the proper Circuit Court of Appeals; and it
is assumed that no criminal case can, upon any ground, be
brought here directly from a Circuit Court of the United States,
unless it be a case of conviction of a capital crime. 29 Stat.
492. But such is not the law. Among other cases, this court,
under the act of March 3, 1891, 26 Stat. 826, c. 517, estab-
lishing Circuit Courts of Appeals, can take cognizance of a
criminal case, upon writ of error to review the judgment of a
Circuit Court, when the case really "involves the construction
or application of the Constitution of the United States." That
act does not make a distinction between civil and criminal
causes such as is implied by the above suggestion of the Gov-
ernment. At the present term of this court we have taken
cognizance of a criminal case involving a misdemeanor, brought
here directly from a Circuit Court of the United States. *Rider
et al.* v. *United States, ante,* 251. And we had previously in
*United States* v. *Rider,* 163 U. S. 132, 138, said : " By section
six [of the Circuit Court of Appeals Act] the judgments or de-
crees of the Circuit Courts of Appeals were made final 'in all
cases arising under the criminal laws,' and in certain other
classes of cases, unless questions were certified to this court or
the whole case ordered up by writ of certiorari as therein pro-
vided. *American Construction Co.* v. *Jacksonville Railway Co.,*

158 U. S. 372, 380.    Thus appellate jurisdiction was given in all criminal cases by writ of error either from this court or from the Circuit Court of Appeals, and in all civil cases by appeal or writ of error without regard to the amount in controversy, except as to appeals or writs of error to or from the Circuit Courts of Appeals in cases not made final as specified in § 6."    We further said in that case that the object of the act of March 3, 1891, c. 517, was to distribute between this court and the Circuit Courts of Appeals the entire appellate jurisdiction over the Circuit Courts of the United States.

The present case does involve the construction and application of the Constitution of the United States.    It is necessary to determine whether the admission of certain testimony was not an infringement of rights secured to the accused by the Sixth Amendment of the Constitution, declaring that " in all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him."

It appears from the bill of exceptions that the Government offered to read to the jury the written statement of William Robert Taylor, taken in a preliminary examination before United States Commissioner Wilson of the case of the United States against Columbus W. Motes, William Robert Taylor, John Littlejohn and Dodge Blackenship.    For the purpose of " laying a predicate " for offering that statement in evidence, Captain B. W. Bell was examined.    He testified " that he was a special officer of the Department of Justice; that he had been engaged in working up the cases against these defendants and preparing them for trial; that in August, 1898, he caused the arrest of said William Robert Taylor and also Columbus W. Motes, John Littlejohn and Dodge Blankenship, on a charge of conspiracy and murder of W. A Thompson, and that on the 19th day of August, 1898, during and on the second day of their preliminary trial, one of the defendants, William Robert Taylor, voluntarily became a witness for the prosecution, and made a statement implicating in said murder Columbus W. Motes, John Littlejohn and Dodge Blankenship, who were at that time having their preliminary hearing before said commissioner, and also implicating in said murder Walter W. Motes and Jasper Rob-

inson, who had been brought to said preliminary trial as witnesses for the Government, and that on the second day of said preliminary trial he (Bell) caused the arrest of the said Walter W. Motes and Jasper Robinson; that Taylor and the other three defendants on trial with him were held for trial by the commissioner and committed to jail without bail to await trial, and that since that time the said Taylor has been confined in the Jefferson County, Alabama, jail under commitment issued by said commissioner; that after the beginning of the present trial on the 20th of September, 1898, he went to the jail, took said Taylor into his custody more than two days before said Taylor escaped, and that said Taylor had not been in jail since, but that he had placed him in charge of one Ed. May, a witness for the Government in this case, and instructed May to let Taylor stay at the hotel at night with his family, and that in pursuance of said instruction Taylor remained at the hotel Tuesday night and Wednesday night before he absconded on Thursday; that he saw Taylor in the corridors of the court room about 10 o'clock A. M. Thursday, before he was called as a witness, about 11 o'clock the same day, and that when Taylor failed to respond he made a search for him in the city of Birmingham, and telegraphed to several places, and could not find him or learn anything at all as to his whereabouts." Bell further testified that on the preliminary trial before H. A. Wilson, United States commissioner, "Walter W. Motes and Jasper Robinson were arrested during the trial of the other defendants, Columbus W. Motes, John Littlejohn and Dodge Blankenship, said Taylor having implicated them in his testimony upon said trial. The defendants were all represented upon said preliminary trial by Mr. Lee Cowart. Mr. Cowart cross-examined the witness, as shown in the testimony; that all of the defendants, including the said Walter W. Motes and Jasper Robinson, had an opportunity to cross-examine the said witness Taylor, and he, in fact, was cross-examined by Mr. Cowart, acting either as attorney for Columbus W. Motes, John Littlejohn and Dodge Blankenship, or for all the defendants; that said cross-examination was reduced to writing; that he (said Bell) had never made or offered the said Taylor any inducements, promises, reward or

hope, to induce him to make said statement; that before said Taylor was examined as a witness on the said preliminary trial he was taken to the office of the United States attorney, who cautioned him to make no statement unless it was purely voluntary, and told him emphatically that he could make no promise and offer him no hope whatever, and that said Taylor stated that he made the statement voluntarily and to relieve his own mind."

The United States marshal testified on behalf of United States that he had instructed his deputies that Taylor had escaped; that he had offered a reward of two hundred dollars for his arrest; that he had made diligent search in the city of Birmingham for Taylor, and could not learn anything as to his whereabouts. The chief of police of the city of Birmingham testified that he had not been officially notified that Taylor had escaped, but that he had seen something concerning it in the newspapers, and that he had made no special effort to arrest him and had no information as to his whereabouts. The United States then offered as a witness a deputy sheriff, who testified that the sheriff of Jefferson County and his deputies had been on the lookout for Taylor ever since his absence was known; that they had had photographs taken of him and sent them to various places, and that the deputies had been on the lookout for him all over Birmingham and other parts of Jefferson County, and that they had been unable to find him anywhere.

The Government introduced as a witness H. A. Wilson, who testified as follows: "I am a United States commissioner and held the preliminary trial in the case against these defendants on the 18th and 19th days of August, 1898. The defendants Columbus W. Motes, William Robert Taylor, John Littlejohn and Dodge Blankenship were brought before me upon a warrant issued on affidavit before United States Commissioner R. A. Moseley, Jr., by special officer Bell. Jasper Robinson and Walter W. Motes were present in court while the case was being heard. William Robert Taylor, one of the defendants, during the trial proposed to make a statement in the nature of a confession. I cautioned him, and told him that he could not be made to testify unless he chose to do so, and asked him if

any inducement or promise had been made or offered to him.
He said there had not; that the statement was voluntary, and
he made it to relieve his mind.   Walter W. Motes and Jasper
Robinson were present in court as defendants at the time, as
well as the other defendants who were on trial.   I swore Wil-
liam Robert Taylor as a witness, administering to him the usual
oath.   He was then examined, and his testimony was committed
to writing.   I identify this statement (referring to the evidence
of Taylor here handed to the witness) as the evidence taken
before me.   In his testimony, as is shown and as was the fact,
he implicated the defendants Jasper Robinson and Walter W.
Motes, who were arrested then and there.   The defendants
Columbus W. Motes, Blankenship and Littlejohn were repre-
sented by Mr. Cowart, and so were the defendants Walter W.
Motes and Jasper Robinson as soon as they were arrested, and
the trial of the four defendants then on trial, to wit, Columbus
W. Motes, William Robert Taylor, John Littlejohn and Dodge
Blankenship, was proceeded with and concluded in the presence
of the defendants Jasper Robinson and Walter W. Motes.   Mr.
Cowart, as a matter of fact, did cross-examine the witnesses, as
is shown by this testimony and as I recollect it, and all of the
defendants, including Walter W. Motes and Jasper Robinson,
were allowed by me an opportunity to cross-examine, although
no separate trial was had, and all of these were examined with-
out bail."

The testimony or statement given by Taylor at the prelimi-
nary trial of part of the defendants was then read in evidence by
the Government, the accused objecting on the ground that a
sufficient predicate had not been made for its introduction; but
the objection was overruled and an exception taken.   The de-
fendants Walter W. Motes and Jasper Robinson severally ob-
jected to the reading of Taylor's statement against them on
the ground that they were not on preliminary trial at the time
the testimony was taken, were not parties to the case then be-
ing tried, and had not legally been called upon to cross-examine
the witness.   Those objections were also overruled, and an ex-
ception was taken.

Taylor's statement was lengthy, and showed a cross-examina-

tion or an opportunity for the cross-examination of Taylor by the present defendants. It was quite sufficient, if accepted by the jury as true, to establish the guilt of some if not of all the accused. It is important to observe that at the time Taylor's statement was offered in evidence there had been no proof whatever of the conspiracy charged. Conspiracy was the basis of the prosecution; for in the absence of a conspiracy, in the carrying out of which the alleged murder was committed, the prosecution must have failed; the crime of murder, apart from the conspiracy to deprive a citizen of a right or privilege secured by the Constitution and laws of the United States, being punishable only by the State.

We are of opinion that the admission in evidence of Taylor's statement or deposition taken at the examining trial was in violation of the constitutional right of the defendants to be confronted with the witnesses against them. It did not appear that Taylor was absent from the trial by the suggestion, procurement or act of the accused. On the contrary, his absence was manifestly due to the negligence of the officers of the Government. Taylor was a witness for the prosecution. He had been committed to jail without bail. We have seen that the official agent of the United States in violation of law took him from jail after the trial of this case commenced, and, strangely enough, placed him in charge not of an officer but of another witness for the Government with instructions to the latter to allow him to stay at a hotel at night with his family. And on the very day when Taylor was called as a witness, and within an hour of being called, he was in the corridor of the court house. When called to testify he did not appear.

In *Reynolds* v. *United States*, 98 U. S. 145, 158, 159, which was an indictment for bigamy committed in Utah—the prosecution being under section 5352 of the Revised Statutes of the United States—the trial court admitted proof of what a witness had stated on a former trial of the accused for the same offence but under a different indictment. This court said: " The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot

complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." In that case reference was made to several authorities, American and English, and the court further said: " The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong; and, consequently, if there has not been, in legal contemplation, a wrong committed, the way has not been opened for the introduction of the testimony."

In his Treatise on Constitutional Limitations, Cooley, after observing that the testimony for the people in criminal cases can only, as a general rule, be given by witnesses in court, at the trial, says: " If the witness was sworn before the examining magistrate, or before a coroner, and the accused had an opportunity then to cross-examine him, or if there were a former trial on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the opposite party." Cooley's Const. Lim. (2d ed.) *318.

In *Regina* v. *Scaife*, 2 Den. Cr. C. 281; 285, 286; *S. C.* 17 Q. B. 238; 5 Cox Cr. C. 243, which was an indictment against three persons for a felony, it appeared that a witness had been kept out of the way by the procurement of one of the accused, and the question was whether the prosecution could use the deposition of the absent witness taken before magistrates in the mode directed by 11 & 12 Vict. c. 42, § 17. It was held by all the judges that the deposition was not admissible against a defendant who had not caused the absence of the witness. Lord Campbell, C. J., said: " I am of opinion that the rule for a new trial must be made absolute. Evidence having been given that the defendant Smith had resorted to a contrivance to keep the

witness out of the way, the deposition was admissible against
him; but it was not admissible against the other defendants,
there being no evidence to connect them with the contrivance.
The learned judge, Cresswell, J., in his summing up to the jury,
seems to have made no distinction as to the duty of the jury to
consider the deposition of the absent witness as evidence against
the defendant Smith alone, and not as against the others.  The
question then is, whether such a deposition is admissible against
a prisoner without proof that the deponent has been kept away
by his contrivance or without proof of the death of the witness.
No case has yet gone so far; and I should be afraid to lay
down a rule which would deprive a prisoner of the advantage
of having a witness for the prosecution against him examined
and cross-examined before the jury, upon every matter that
may be material to his defence.  I, therefore, think that the
deposition was improperly admitted against Scaife and Rooke,
and that there should be a new trial."    Patteson, J.—"The
deposition of the absent witness, Sarah Ann Garnett, was ad-
missible as against the defendant Smith, by whose contrivance
she was kept out of the way, but it ought to have been applied
to the case against him only, and not to the case against the
other prisoners.  No such distinction appears to have been
made at the trial, but the evidence was allowed to go to the
jury generally against all the prisoners, it being assumed, with-
out any evidence whatever to support the assumption, that they
all were connected with the contrivance to keep the witness
out of the way."   Coleridge, J.—" Before the enactment of
11 & 12 Vict. c. 42, I always understood the law was, that if a
witness were absent, either by reason of the death of the witness,
or by the procurement of the prisoner, the deposition was receiv-
able in evidence against him.  But I believe these were the
only two cases where the absence of a witness let in his depo-
sitions.  Absences from every other cause were within the same
category, and did not render them admissible.  The seventeenth
section of the recent statute took another case—where a witness
was proved to be so ill as to be unable to travel—out of one
category and put it into another."

In the present case there was not the slightest ground in the

evidence to suppose that Taylor had absented himself from the trial at the instance, by the procurement or with the assent of either of the accused. Nor (if that were material) did his disappearance occur so long prior to his being called as a witness as to justify the conclusion that he had gone out of the State and was. permanently beyond the jurisdiction of the court. His absence, as already said, was plainly to be attributed to the negligence of the prosecution. The case is not within any of the recognized exceptions to the general rule prescribed in the Constitution.

It is suggested that the action of the Circuit Court was in harmony with the decisions of the Supreme Court of Alabama. *Lowe* v. *State*, 86 Ala. 47 ; *Pruitt* v. *State*, 92 Ala. 41. We have examined the cases in that court to which attention has been called, and do not think they sustain the ruling of the court below under the circumstances disclosed by this record. But the question cannot be made to depend upon the rules of criminal evidence prevailing in the courts of the State in which the crime was committed. It must be determined with reference to the rights of the accused as secured by the Constitution of the United States. That instrument must control the action of the courts of the United States in all criminal prosecutions before them. We are unwilling to hold it to be consistent with the constitutional requirement that an accused shall be confronted with the witnesses against him, to permit the deposition or statement of an absent witness (taken at an examining trial) to be read at the final trial when it does not appear that the witness was absent by the suggestion, connivance or procurement of the accused, but does appear that his absence was due to the negligence of the prosecution. We need not decide more in the present case.

For the error referred to the judgment of the Circuit Court must be reversed as to all the plaintiffs in error and a new trial awarded, except as to Columbus W. Motes. The case as to him rests upon peculiar grounds, because of his testimony on behalf of the accused at the final trial. He testified : " My name is Columbus W. Motes ; I am about thirty years old. I know the defendants who are on trial for the murder of W. A.

Thompson; I knew Thompson, and know when and where he was killed; I also know who killed him. He was killed on March 14th last, near his home, by myself and William Robert Taylor. No other person had anything whatever to do with it. I went to Taylor's house on March 13th, 1898, just after he had returned from Birmingham, where he had been attending the United States court as defendant. We were both under indictment in the United States court at Birmingham for illicit distilling. Taylor attended court and I did not. W. A. Thompson was a witness against both of us, but I did not know who reported us. Taylor told me on the 13th of March, the day he got home from the United States court at Birmingham, that he got our cases continued on March 12th, 1898, until the next term of the court. We then and there agreed to kill Thompson to keep him from appearing as a witness against us at the next term of the court. We agreed to kill him on the next day as he came from Sylacauga, so the neighbors would think he was killed by Dodge Blankenship and Ad Smith, who only a few days before that time had been arrested and bound over for illicit distilling. We took my gun, a rifle, and went to the place where we knew Thompson would pass and waited until he came along. Taylor shot him three times with the rifle. I was watching, according to the agreement between us, to see if any person saw us. The third shot is the one that killed him. The bullet entered his forehead. After we killed him, which was about the middle of the evening, we got his money out of his pockets, eighteen dollars, all in two-dollar bills, and the next morning we hid it in a tree near Taylor's house. Neither John Littlejohn, Dodge Blankenship, Walter Motes or Jasper knew anything about our plans to kill Thompson, were not present when he was killed, and had nothing whatever to do with the murder."

In this evidence the jury had conclusive proof of the guilt of Columbus W. Motes of the crime charged in the indictment. The admission of the statement of Taylor in evidence was, therefore, of no consequence as to him; for in his own testimony enough was stated to require a verdict of guilty as to him, even if the jury had disregarded Taylor's statements

altogether. We can therefore say, upon the record before us, that the evidence furnished by Taylor's statement was not so materially to the prejudice of Columbus W. Motes as to justify a reversal of the judgment as to him. It would be trifling with the administration of the criminal law to award him a new trial because of a particular error committed by the trial court, when in effect he has stated under oath that he was guilty of the charge preferred against him.

It is proper to say that there are other questions of a serious character raised by the assignment of errors. But as those questions may not arise upon another trial, we do not now consider them.

*The judgment as to Columbus Winchester Motes is affirmed, but the judgment as to all the other plaintiffs in error is reversed, with directions to grant a new trial and for further proceedings consistent with this opinion.*