Petition of ALBERT JAY TOOKER. ALBERT JAY TOOK-
ER, Defendant and Appellant, v. State of Montana, ED-
WARD ELLSWORTH, Warden of Montana State Prison,
Plaintiff and Respondent.

No. 10984.
Submitted January 11, 1966. Decided February 11, 1966.
410 P.2d 923.

Waldo Spangelo (argued), Havre, for appellant.

Forrest H. Anderson, Helena, Robert D. Morrison, County Atty., Havre, William G. Sternhagen, Asst. Atty. Gen. (argued), Helena, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is a petition for a writ of habeas corpus by petitioner who is now serving a forty year term in the state penitentiary for the crime of murder. Petitioner was tried before the Honorable C. B. Elwell in the district court of the twelfth judicial district, in and for the County of Hill, State of Montana.

Petitioner was found guilty of second degree murder in October 1963. No appeal was taken by petitioner. He filed this petition in this court on May 25, 1965.

This is the petitioner's third appearance in this court. See

Petition of Tooker, 144 Mont. 158, 394 P.2d 1021, which was an original proceeding concerning a transcript of the judgment roll and In re Petition of Tooker, 146 Mont. 35, 403 P.2d 204.

On June 24, 1965, the Supreme Court sent the petition to the trial court for a hearing which was held on September 3, 1965. This hearing was held before Judge Elwell who had appointed Waldo Spangelo, Esq., of Havre, to represent the petitioner, and from this hearing a full transcript of the proceedings was made available to this court. Judge Elwell made findings of fact and conclusions of law which found that petitioner had not been misled concerning his right of appeal; that he had had effective counsel; that he had a fair trial, and denied the writ. Thereafter, the matter was ably argued before this court for petitioner by Mr. Spangelo on January 11, 1966.

Petitioner contends his confinement is unlawful in that his conviction was obtained in violation of:

(1) "Confrontation" clause of Sixth Amendment to the United States Constitution;

(2) That he was denied effective counsel;

(3) That he was denied the fair and impartial trial inherent in the "due process clause" of the Fourteenth Amendment of the United States Constitution and sections 6 and 8, of Art. III of the Montana Constitution; and

(4) That he was denied "equal protection of the laws" of the Fourteenth Amendment of the United States Constitution.

The murder of one Harvey W. Dishaw, in an ice house of the Great Northern Railway Co., on June 7, 1963, resulted in the petitioner being charged with first degree murder. An eye-witness, one Flowers, pointed out the petitioner to local officers who were investigating the slaying and he was arrested in a local bar. Statements taken later revealed that petitioner had fired several shots over Flower's head in order to scare him, and to get him away from Dishaw, prior to the shooting of Dishaw. The noise of the gun, a .357 Magnum, going off in the small confines of an ice house, did remove Flowers from

the line of fire, probably quite rapidly, but did not kill his memory as to who did the shooting.

Petitioner was arrested between 9:00 P.M. and 9:10 P.M. and taken to the city jail where he was informed that he was being held on a charge of first degree murder. He was interviewed by the police twice during the evening and another interview took place with the county attorney and the police officers about midnight. The first interview in the city jail was short and unsatisfactory due to the confusion in the jail caused by numerous persons being present, however, officer Zartman, who conducted the interview, testified as follows concerning the procedures used:

"Q. What sort of investigation do you give a man when you are questioning him? A. The normal procedure, which is handled by myself and other members of the police force. We first introduce ourselves and others present during the investigation or questioning and to advise them that they have a legal right to counsel and that anything they say may be used for or against them in the court of law and that they need not say anything.

"Q. What did he say, that he wanted to see a lawyer or counsel? A. We still encourage them to talk anyway, we don't give up.

"Q. You don't give up interrogating? A. No, sir.

"Q. Did Mr. Tooker ask to see a lawyer that night? A. No, sir.

"Q. Do you remember whether he asked to make any phone calls? A. He did not." (We comment here that a reading of the response to the first question above would indicate the answer is not responsive. However, the matter is cleared up by a direct answer to later questions.)

Petitioner was next taken from the city jail and its confusion out to a police car where officer Zartman and Chief of Police Leon Davidson questioned petitioner. Petitioner and Davidson were in the front seat of the patrol car and Zartman was in the

rear seat where he testified he could make notes of what took place. Officer Zartman further testified:

"A. One of the questions we asked Al Tooker was regarding that he calls him the Swede. I will have to refer to him as the Swede. 'One of the things he should give me is a medal for killing that Swede.' Your honor there is several pretty foul words in here, may I skip them?

"Court: You can use them so far as I am concerned. We want to know what he said.

"A. He said: 'That Big Swede put his arm on me and the shit hits the fan. I can't whip that big S.O.B.' He also stated that 'it would be a poor man from Montana that wouldn't take a shot at an Okie. Okie didn't want any part of that lead and he took off.' He also said, 'I will cop out for twenty (20) years, but I won't help you find that gun, that gun is gone.' He also refers to Swede running into a hornet's nest and that he was as drunk as me. He also stated during our questioning that he would like it in the papers that a Norwegian had killed a Swede.' He also said 'get a deck of cards and see how close I miss that Hoosier heart.'"

At about this stage of questioning the county attorney arrived and the officers took petitioner to the office of the police magistrate where he was again warned concerning any statement he gave could be used against him by the county attorney and that after this warning there was a reiteration of what he had told the officers before the arrival of the county attorney. During this period of questioning officer Zartman testified that the petitioner said:

"A. He said on requestioning: that he had to turn around at about three feet and let him have it. 'I had to scare Okie off first. I didn't miss him once I am sorry he died but you can't let a man take your lettuce from you, I am going to leave Okie live and come back and scab on you guys. Okie is a dirty rat, S.O.B. I can beat this rap. I got a right to kill people. You can ask Jennie at Connelly's Bar if Swede didn't say that he

212

would kill Tooker if he rode up and down the highline. I knocked one in the head in Great Falls, and I drilled one here, I guess that is the way it is. I did what I thought was right at the time to protect myself. You can't whip a man like Swede, you have to burn him.' "

All of this conversation took place during the evening of Friday, June 7th, and the early morning hours of June 8th. Saturday and Sunday were free of any activity by the law enforcement officers and it was not until Monday morning, June 10th, that a complaint was filed in the Justice Court before Justice of Peace, Emmett Stallcop. The next morning petitioner appeared before Justice Stallcop at which time the complaint was read to him and he was again advised of his right to counsel. While the petitioner denies that he was advised of his rights at this stage, including the waiver of a preliminary hearing, the record contradicts his claims. Upon waiver of preliminary hearing in the Justice Court the county attorney filed an information in the district court and the court appointed attorney John Gillan as counsel.

In the meantime the city and county law officials had detained several witnesses, as material witnesses, and due to the fact they were transients the county attorney decided to perpetuate their testimony via depositions as provided for by Constitution and statutes (Art. III, § 17, and section 94-9111, R.C. M.1947). Notice was given petitioner and his attorney and the depositions were taken of two witnesses, Lloyd Fox and Guy Wynne Flowers, on June 14th, two days after arraignment and one week after the shooting. The depositions were taken by a court reporter with petitioner, his attorney, the county attorney and the two witnesses being present. The deposition of Fox contains 13 pages of direct examination and 11 pages of cross examination by petitioner's attorney, John Gillan. Flowers' deposition has 16 pages of direct and 16 pages of cross examination. When the case came on for trial these depositions were read to the jury due to the fact neither Fox nor Flowers

could be located either in the state or at the addresses given at the time of the taking of the depositions. Concerning the court's handling of the depositions we will refer later.

After a jury trial, petitioner who had been charged with first degree murder, was convicted of second degree murder and sentenced to 40 years in the state penitentiary. Now, after some two years in the penitentiary he contends that he was deprived of a right to an appeal even though the hearing held on this writ conclusively shows that he neither asked his attorney to make an appeal, either while with him after sentence or later by mail, nor did he indicate to the deputy sheriff who took him to the penitentiary that he intended to appeal. It would appear that his two years in the penitentiary has been devoted to a course in appellate practice and procedure.

Before proceeding further we would like to quote from a very recent and learned opinion from the Honorable W. D. Murray, United States District Judge for the District of Montana, in the case Donald J. Frost v. State of Montana, and Ed Ellsworth, Jr., Warden, ...... F.Supp....... dated January 20, 1966. (U.S.D.C.ButteDiv.) That case like this concerned habeas corpus and therein Judge Murray said:

"Before considering the evidence, a few observations concerning the principles of law governing this and similar habeas corpus proceedings are appropriate. In the first place, there is a rebuttable presumption that official duty has been regularly performed, and that a judicial record, when not conclusive, does still correctly determine or set forth the rights of the parties. Section 93-1301-7(15) (17), R.C.M., 1947. Furthermore, a conviction after a public trial in a state court by verdict or plea of guilty carries with it a strong presumption of constitutional regularity in the state judicial proceedings. Lyle v. Eidson, 8 Cir., 182 F.2d 344; Miller v. Crouse, 10 Cir., 346 F.2d 301; Schlette v. People of State of California, 9 Cir., 284 F.2d 827. The burden of overcoming this presumption and establishing that his conviction was obtained in violation of

214

his constitutional rights rests upon the petitioner. Hawk v. Olson, 326 U.S. 271 [66 S.Ct. 116, 90 L.Ed. 61] ; Brown v. Allen, 344 U.S. 443 [73 S.Ct. 397, 97 L.Ed. 469] ; Schlette v. People of State of California, supra."

■ Considering the petitioner's basis for requesting a writ of habeas corpus we will dispose of three and four, fair trial and due process, and the equal protection of the law first. Considering the evidence with the foregoing principles in mind the petitioner has failed to meet his burden of overcoming the presumption of the constitutional regularity of the proceedings before the trial court.

■ Concerning proposition two "right to effective assistance of counsel" we would like again to comment, as we have before, on this constant charge made by convicted felons. This court, and we are sure the other appellate courts of this country, are in the same position, is constantly having to listen to this plea from convicted felons. So rare are the pleas valid that such cases are highlighted due to their rarity. The bar of this state, and Mr. Gillan in particular, are called upon to perform such defenses, often at a personal sacrifice and financial loss, and often receive abuse from an uninformed public. In doing so they contribute the highest of public service for which they should be honored rather than abused. We find little merit to this contention.

Last but not least, we concern ourselves with the question raised by the introduction of the two depositions taken from Fox and Flowers and introduced at the trial. Petitioner contends that this procedure deprives him of the right of "confrontation" thereby depriving him of constitutional rights given to him by the Sixth Amendment of the United States Constitution and Article III, § 16 of the Montana Constitution.

"The Montana Constitution provides in Article III, § 16, as follows :

"In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the

nature and cause of the accusation; *to meet the witnesses against him face to face;* to have process to compel the attendance of the witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same." (Emphasis supplied.)

The Sixth Amendment to the Constitution of the United States provides as follows:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him;* to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The Fourteenth Amendment, § 1, is also involved in the consideration of this petition, and reads as follows:

"1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without *due process of law;* nor deny to any within its jurisdiction the *equal protection of the laws."* (Emphasis supplied.)

While an infringement of section 17 of Article III of the Constitution of the State of Montana is not directly cited in the petition, it is certainly implied. Section 17 of Article III of the Montana Constitution reads as follows:

"No person shall be imprisoned for the purpose of securing his testimony in any criminal proceeding longer than may be necessary in order to take his deposition. If he can give secur-

ity for his appearance at the time of trial, he shall be discharged upon giving the same; if he cannot give security, his deposition shall be taken in the manner prescribed by law, and in the presence of the accused and his counsel, or without their presence, if they shall fail to attend the examination after reasonable notice of the time and place thereof. *Any deposition authorized by this section may be received as evidence on the trial, if the witness shall be dead or absent from the state."* (Emphasis supplied.)

By statute, Montana provides as follows for depositions in criminal cases. R.C.M. 1947, § 94-9111.

"The deposition, or a certified copy thereof, may be read in evidence in any court in this state by either party on the trial, *upon it appearing that the witness is dead or is absent from the state,* and the same objections may be made to the deposition at the trial as if the witness had been examined in court." (Emphasis supplied.)

The petitioner sets forth at some length his argument that the two depositions should not have been allowed at the trial, not only on the grounds of a constitutional right of confrontation, but also that there was a failure by the state to comply with the provisions of the statute as to when a deposition can be introduced. We will consider the alleged failure to comply with the statute allegation first.

It should be especially noted that section 94-9111, is a statute applicable to both parties to a criminal action and can be of equal import to a defendant in the perpetuation of testimony as it is for the state. To question either its constitutionality or applicability might well seriously damage an important defense procedure. Here, petitioner alleges that there was no showing that either of the witnesses were dead, and that an insufficient showing was made by the state to have allowed the introduction of the depositions on the fact that either or both of the witnesses were absent from the state.

At the time of the filing of the information on June 12,

1963, the county attorney was faced with the problem of what to do with two principal witnesses, Fox and Flowers. They were transients to the community who sought work as the climate made it available. There was to be no jury term until late September or October, the very months that provided the work climate in that area. He could have incarcerated them as principal witnesses under the provisions of the statute if they refused to give depositions, but here they willingly gave the depositions so it was necessary to release them hoping they would be available at the time of trial. Both Fox and Flowers gave out of state addresses and both said they thought they would be out of state at the time of the trial.

When the court set the calendar in September, the county attorney's office immediately had subpoenas issued on the 20th of September and the subpoenas for Fox and Flowers were turned over to the sheriff's office. The record shows that both men had left Havre and at the time of the issuance of the subpoenas their whereabouts was unknown; that they were not residents of the State of Montana; that as to Fox, he was last heard from in the Glasgow, Montana, area but had left there and that law officials had no knowledge of his whereabouts; and that as to Flowers they contacted authorities in Kansas City, Missouri, but they were unsuccessful in locating him.

While the petitioner cites several cases in support of his argument that an insufficient showing was made to allow the admission of the two depositions, Archina v. People, 135 Colo. 8, 307 P.2d 1083, People v. Rinesmith, 40 Cal.App.2d 786, 105 P.2d 1021, the fact situations in these cases are not the facts of this case. Here a real effort was made to find the witnesses and a foundation was laid by the state as to the search. Rather, we agree with the trial judge that a sufficient showing was made at the time of trial, issuance of subpoenas and a search by law enforcement officers, to allow the admission at trial. Concerning the use of the depositions at the trial the following testimony arose at the introduction of the depositions:

"MR. MORRISON: Your Honor, at this time, I would like to introduce into evidence the deposition of Guy Flowers, for the reason that this witness is not to be found in the State of Montana.

"THE COURT: What have you to say Mr. Gillan? Do you have any objections?

"MR. GILLAN: Your Honor, I am going to enter an objection to the introduction of this deposition on this one ground and this is going to be given on evidence that the jury do not have an opportunity to observe the demeanor and conduct of this witness when he was being examined. This is a most serious crime with which my client is charged and the fact the jury does not have the opportunity to observe the demeanor and or the general make up of this witness. It can only read cold from the testimony and for that reason I object to its introduction.

"THE COURT: They won't read it, it will be read to them.

"MR. GILLAN: They will read a cold record as it is and they will not have an opportunity to observe this particular witness and for that reason I object to the reading of the deposition to the jury on the ground that it's prejudicial to the rights of the defendant.

"THE COURT: Objection overruled.

"MR. MORRISON: If it please the Court, in order to facilitate the introduction of this deposition into evidence I would like to request permission to solicit the assistance of the Deputy County Attorney to answer the questions as I ask them.

"THE COURT: Do you have any objections to that Mr. Gillan?

"MR. GILLAN: No objection.

"THE COURT: You have a copy of this?

"MR. GILLAN: Yes, I have, Your Honor.

"MR. MORRISON: Mr. Gillan if you would desire, when we get to that portion of the cross examination, you may ask the questions on the cross examination.

"MR. GILLAN: All right, I shall."

This court early in our judicial history set forth the procedure to be followed concerning the use of depositions in criminal cases, and this procedure has been cited and recognized as the law by both state and federal courts. In State v. Byers, 16 Mont. 565, 41 P. 708, this court held in effect that it is the right of a defendant in a criminal case to meet the witnesses against him face to face, as provided in section 16 of Art. III of our Constitution, but is not an absolute right, for the very next section of the Constitution (Art. III, § 17) provides for the taking of the deposition of a witness and that such deposition "may be received as evidence on the trial, if the witness shall be dead or absent from the state," and the deposition may be taken without the presence of the defendant if he fails to attend after notice. State v. Vanella, 40 Mont. 326, 106 P. 364; State v. Storm, 127 Mont. 414, 265 P.2d 971; Grove v. United States, 3 F.2d 965 (C.C.A. 4th Cir. 1925); Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500.

Here the objection made by petitioner's counsel went only to the fact that the jury "would not have the opportunity to observe the demeanor and conduct of the witness when he was being examined," and did not go to the showing of absence from the state. We are of the opinion that regardless of the words of the objection, the matter of confrontation was before the court, and it properly allowed admission of the depositions, for by petitioner's very act of participating in the taking of the depositions, the thoroughness of the cross-examination by petitioner's attorney negates any argument by petitioner that he did not have the right of cross-examination of the witnesses. As the record shows the trial court was willing to allow petitioner's attorney to read all the cross-examination to the jury.

The United States Supreme Court in the case of Motes v. United States, 178 U.S. 458, 472, 20 S.Ct. 993, 998, 44 L.Ed. 1150, recognized certain exceptions to the rule on confrontation when it said:

" 'If the witness was sworn before the examining magistrate, or before the coroner, and the accused had an opportunity then to cross-examine him, or if there were a former trial on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick or unable to testify, or has been summoned but appears to have been kept away by the opposite party.' Cooley's Const.Lim. (2d ed. 318)."

All constitutional requirements having been met when petitioner was afforded adequate opportunity for cross-examination, the petition is therefore denied.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE, ADAIR and CASTLES concur.