EDWARD HIGGINS, JR. *v.* STATE OF MARYLAND

[No. 493, September Term, 1978.]

*Decided January 12, 1979.*

The cause was argued before Liss, Wilner and MacDaniel, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Michael A. Anselmi, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, J. Owen Wise, State's Attorney for Caroline County,* and *Phillip Carey*

*Foster, Assistant State's Attorney for Caroline County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

About 11:00 p.m., on the evening of March 15, 1974, an employee at the electric plant of the Easton Utilities Commission saw a black truck loaded with reels of wire leaving the plant. There appeared to be three people in the truck. This event was, in due course, reported to the Easton police department, and, from them, the State Police learned of it. A police radio broadcast advised officers to be on the lookout for the truck.

Less than an hour later, a State trooper heading toward the Annapolis barracks to start his tour of duty spotted a black truck loaded with wire proceeding westerly on U. S. Route 50 toward the Chesapeake Bay Bridge. He followed the truck across the bridge, stopped the vehicle at the toll plaza, and placed its three occupants under arrest. One of the occupants — the driver of the truck — was appellant; another occupant was a man named James Edward Custis, Jr. Employees of the electric plant were advised of the arrest, and they subsequently identified the wire in the truck as having been stolen from the plant.

As a result of all of this, appellant was charged on May 24, 1974, in a three-count Criminal Information with grand larceny (feloniously stealing 12,569 pounds of copper wire of the value of $6,500), receiving stolen goods (the same property), and breaking and entering the storeyard of the plant and stealing therefrom chattels worth $6,500.

Appellant filed a petition for change of venue which, after a hearing held on July 31, 1974, was denied. Trial commenced on September 19, 1974, before a jury in the Circuit Court for Talbot County. One of the first — and key — witnesses to testify against him was his friend, James Edward Custis, Jr. Custis described the break-in and the stealing of the wire in considerable detail; and to say that he inculpated appellant would be an understatement. Whether for this reason or some other, appellant must have become disenchanted with the way

things were going because without waiting to find out what fate the jury had in store for him, he departed the scene during the trial, forfeiting his bail as a result. The jury convicted him.

It is not entirely clear when the minions of the law caught up with appellant, but the record does show that on December 1, 1976 — some two years later — he was returned to the Circuit Court for Talbot County and thereupon sentenced to prison for 15 years.[1] He filed a timely appeal to this Court. (*Higgins v. State,* No. 1239, Sept. Term, 1976.) In connection with that appeal, it turned out that the court reporter had lost his notes of the hearing held on appellant's motion for a change of venue. It therefore proved impossible to produce a transcript of what had occurred at that hearing, or, it appeared, a "satisfactory substitute" for such a transcript. Since the correctness of the court's denial of the motion was an issue in the appeal, this Court, on September 20, 1977, vacated the judgment of conviction and the trial court's ruling on the motion for change of venue, and remanded the case to the Circuit Court for further proceedings.

Upon remand, the State made certain amendments to the factual allegations in Count I of the Criminal Information (grand larceny), the court denied appellant's motion to dismiss the Information grounded upon the allegation that the then-incumbent State's Attorney for Talbot County had represented appellant at a bail hearing following his arrest back in 1974, and, upon appellant's renewed motion, the case was transferred to Caroline County. There, he was again convicted by a jury of grand larceny and was again sentenced to prison for 15 years.

In this appeal, appellant raises eight issues, but it is only necessary that we consider the first — whether the court erred in admitting into evidence the recorded testimony of Mr. Custis given at the first trial. We think that it did, and, for that reason must again set aside the conviction.

---

1. This was not all. At some point, apparently during the 2-year hiatus, appellant ran afoul of the law in Pennsylvania, because the docket entries show that the 15-year sentence is to commence "when he has been released by the Pennsylvania Authorities to the Authorities of Maryland for the purpose of serving this Sentence."

There is no doubt or dispute that Custis' testimony was highly prejudicial to appellant. As noted, he was an eye-witness — an accomplice — and, if believed, his testimony together with but the legally required minimum of corroboration,[2] would have sufficed to warrant and sustain his conviction. There is also no doubt that Custis was not present at the second trial, and that his recorded testimony from the first trial was admitted solely upon the basis that he was "unavailable". If Custis was indeed "unavailable" to testify *viva voce,* the record of his prior testimony would have been admissible. *Contee v. State,* 229 Md. 486 (1962); *Crawford v. State,* 282 Md. 210 (1978). Appellant concedes as much. The question, however, is whether Custis was really unavailable.

Trial commenced on April 11, 1978. About mid-morning on the 12th — the second day of trial — the prosecutor advised the court that, except for Mr. Custis, he had completed his case. He stated that both he and defense counsel had caused a summons to be issued for Custis, each directed to a different address, and each without success. He stated further that defense counsel had attempted to contact Custis in other ways, also in vain; that a defense witness had, the day before, given counsel a third address for Custis, and that a summons had been promptly issued for him at that address; that the prosecutor did not know whether the latest subpoena had been served; but that, in any event, the State had used its best efforts to secure the appearance of Custis.[3]

**2.** *See* Brown v. State, 281 Md. 241 (1977); Bennett v. State, 283 Md. 619, 392 A. 2d 76 (1978). Custis was also tried and convicted for his role in the offense. He received a suspended sentence and was placed on probation. When he was convicted, what sentence he received, and how long his probationary period was are questions unanswered in the record.

**3.** The record shows that on April 3, 1978, a subpoena for Custis was issued at the State's request. It showed and was directed to an address in Baltimore City — 200 Aisquith Street — and commanded Custis to appear at 9:50 a.m. on April 11, 1978. Also on April 3, defense counsel caused his subpoena to be issued for Custis. This one showed an address of 1836 Federal Street, in Baltimore City. Both were returned "non est". The third subpoena, issued April 11, 1978, was directed to 1836 E. Fayette Street in Baltimore, and ordered Custis to appear on April 13. There was no indication on this summons as to whether it had been served.

In subsequent discussion among the court and counsel, it developed that:

(1) Defense counsel had previously written to Custis on two occasions in connection with the case. One letter was written on January 12, 1978. It was sent to "1368 Fed Street Building, Baltimore, Maryland 21231" and was returned as "non-deliverable". The second letter was not returned.

(2) The previous day (April 11), appellant's wife gave defense counsel the Fayette Street address, which prompted the issuance of the third subpoena.

(3) In response to the State's renewed urging that it had used its best efforts, defense counsel pointed out that Custis had previously been convicted and that the State "had contact with him through Probation Department, because it was a suspended sentence." He argued:

> "They could find out from where he works, they had his social security number. They had all of this stated information on him, and they could keep a current record. What they have done is issued a summons for a four year old address, and I don't think that is sufficient under the law."

(4) The State advised that it had the court reporter from the first trial in court who was prepared to read into the record Custis' earlier testimony.[4]

After a recess the State produced Sergeant Walter Chase of the Easton Police Department, who testified as to his efforts to locate Mr. Custis. In January, 1978, he said, he attempted to find out if Mr. Custis had a telephone at the 200 Aisquith Street address. He was told that neither Mr. Custis, nor his father or mother (about whom he also inquired) had

---

4. It is most interesting to note that, on April *4*, 1978 — the day after it caused a summons to be issued for Custis — the State had a subpoena issued for the reporter — Mr. Gretzinger — directing him to appear on April *12*, 1978. Gretzinger was called to the stand for the sole purpose of reading Custis' earlier testimony into the record; he gave no other evidence. In the absence of some other explanation (of which the record reveals none), it is a fair inference that, at least by April 4, 1978, the prosecutor had concluded that Custis would be unavailable, and, without making any further effort to secure his appearance, summoned the court reporter in his place.

a telephone listing at that address. Undaunted, on April 3, 1978 — the same day the State's subpoena was issued — Sgt. Chase sent a registered letter to Custis at the same address — 200 Aisquith Street. This letter was accepted by a Michael J. Custis, but he had no idea who that person was (and did nothing to find out). That was the extent of his efforts. Cross-examination of Sgt. Chase is revealing:

"Q. Mr. Custis was convicted of a burglary or grand larceny in Talbot County, is that correct?

A. Yes, sir.

Q. And given a suspended sentence?

A. I believe so.

Q. And placed on probation?

A. I believe so.

Q. Did he have a probation officer in Talbot County?

A. Yes sir, down at the department.

Q. And has he completed his probation sentence?

A. I don't know. I didn't check with them.

Q. Did you check with probation to see if they had a current address on him?

A. No sir, I didn't.

Q. Did you check with probation to see if they had any information on him such as his social security number, employer, driver's license number, or anything like that?

A. No sir, I never checked with Parole and Probation.[5]

Q. But there is an office in Talbot County?

A. Yes sir.

Q. And is it in Easton?

---

5. Later, Sgt. Chase said that he was "almost positive" that the Talbot County Probation Department would not have had a more current address, because supervision of Custis would possibly have been transferred to the counterpart department in Baltimore City. In addition to the fact that this was his own surmise, he apparently made no effort to contact the probation department in the City.

A. Yes sir.

THE COURT: Do you know if he is under supervision and has been transferred to Baltimore, or whether his supervision was still in Talbot County when he went off.

A. Sir, I don't know. I don't believe I was at Custis's trial.

THE COURT: I see.

Q. When you arrested Mr. Custis, did you fill out an information sheet on him?

A. Yes sir.

Q. And that included his employer, mother and father information, his social security number, pertinent data on him?

A. This was the document that I just testified from. That I stated I got the information from. That his father was dead ...

Q. Right ...

A. That is [sic] mother lived at that address and he was living with his mother.

Q. Did a ... you also have the social security number there on that document?

A. I believe, but a social security number is something that you cannot track down. They don't fill out.

Q. Do you have his last known employer there?

A. I believe we do.

Q. And would that be the City of Baltimore?

A. Yes sir.

Q. Did you contact anyone at his last known place of employment to see if they knew where he was?

A. No sir."

Upon this accumulated evidence, the court decided to allow the transcript to be read, at which point appellant himself asked if he could say something. Granted permission, he observed that "[a]ll they had to do was to obtain The

Department of Baltimore City where he work at. He is employed there right now . . . . For the City of Baltimore, the Water Department." To this bit of news, the court responded that "[i]f *you* [appellant] want to get him down here tomorrow, tell your attorney and then he can tell the sheriff . . . . that he can go up to the Water Department and serve it if that is where he is." (Emphasis supplied.) Thus, it concluded,

> "Our ruling will stand, but if that is where he is and *you* get him here later today or tomorrow, we will deal with that when it comes and *you* can certainly call him as a witness." (Emphasis supplied.)

The court then took a recess. Upon its return, the plot thickened some more. The court advised that it had talked with the sheriff's office in Baltimore — that the sheriff would issue a summons directed to the Water Department, but that there were three Water Departments, which might cause a problem. More significant news came from defense counsel. The elusive Mr. Custis had been spotted. A defense witness, Mr. Brady, "had talked to Mr. Custis last night and told him to be down here this morning, and Mr. Custis had indicated to Mr. Brady that he was afraid to come down here for some reason. . . ."

Mr. Brady was then called as a witness and, under oath, confirmed that he had seen Custis on the corner of Chester and Chase Streets between 5:00 and 5:30 the previous afternoon. He said that he told Custis that he was wanted as a witness, but,

> "He told me that he had just changed jobs recently. He had just got this new job and that he couldn't come down here to appear in court because he was scared he would loose [sic] his job. . . ."

Brady said that the new job was driving a dump truck for a construction company, and that, although Brady had offered to pay Custis a day's pay, he nevertheless refused to come. Brady further confirmed that Custis had previously worked for the City Water Department at Wolfe and Gay

Streets, but that he did not know where Custis was presently living or working. Unfazed, the court reaffirmed its decision to allow the reporter to read the previously recorded testimony, noting again that if appellant could produce Custis by 10:00 the next morning, "you can call him as your witness at that time if you want." Mr. Gretzinger thereupon read Custis' prior testimony to the jury and into the record.

We are dealing here, of course, with the Constitutional right of confrontation, a right that has been held to be "fundamental". *Pointer v. Texas,* 380 U. S. 400 (1965). In *Contee v. State,* 229 Md. 486, 491 (1962), the Court of Appeals said:

> "It is well settled that testimony taken at a former trial may be admitted, if it be shown that the witness is dead, insane, or beyond the jurisdiction of the court, or on diligent inquiry cannot be located, or that some other circumstance exists which shows that the witness who gave the testimony at the former trial cannot be procured as a witness at the second trial."

Using this standard which, if modified at all since 1962, has been made even more restrictive with the subsequent application of the Federal Sixth Amendment to State proceedings through the "due process" clause of the Fourteenth Amendment,[6] it is clear that Custis was not sufficiently "unavailable" as to permit admission of his prior recorded testimony. The witness was not dead, insane, beyond the jurisdiction of the court, or, as it turned out, unable to be located.

The problem was that the State made no serious effort to procure him. *See Barber v. Page,* 390 U. S. 719 (1968). It waited until April 3 to request a summons that should have been requested three days earlier.[7] It used an address in

---

**6.** *See* Pointer v. Texas, *supra,* 380 U. S. 400; Barber v. Page, 390 U. S. 719 (1968); Crawford v. State, 282 Md. 210 (1978); Gregory v. State, 40 Md. App. 297 (1978).

**7.** Maryland Rule 742 b directs the clerk to issue a summons upon request of a party "filed at least nine days before trial, not including the day of trial and intervening Saturdays, Sundays and legal holidays." Under this Rule, the request should have been filed no later than March 31. Had this been

Baltimore City that was four years old without the benefit of any subsequent verification, and, indeed, in light of the fact that Sgt. Chase had learned in January that there was no telephone listing for the witness or his family at that address. Fully aware that Custis was then or at least had recently been, on probation, no effort was made to learn of his address from the probation department, either in Talbot County or in Baltimore City. In short, Custis was absent because of the negligent and wholly insufficient efforts of the State to produce him. *See Motes v. United States,* 178 U. S. 458 (1900); *Gaskins v. State,* 10 Md. App. 666, 679 (footnote 6) (1971); *Brooks v. State,* 35 Md. App. 461 (1977).

Ordinarily, this pre-trial lack of effort would itself have been fatal; but here the State had a second chance. At trial, through the efforts of the defense, the State was made aware that Custis was indeed alive and well in Baltimore. There was no evidence, prior to the court permitting the transcript to be read, that Custis was in hiding, that he was avoiding service, or that, with even a modicum of real good faith effort, he could not have been located and served.

The court, for some unexplained reason, cast this obligation on appellant. But it was not *his* duty to produce the witness. The State desired to use his testimony as part of its case, and thus the State had the responsibility either to produce the witness or to establish that he was truly unavailable. It did neither, and for that reason, the admission of the prior recorded testimony was error — reversible error.

> *Judgment reversed; case remanded to Circuit Court for Talbot County for retrial; Talbot County to pay the costs.*

done, perhaps the mystery of Custis' whereabouts could have been cleared up earlier.