FILED

04/30/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0086

DA 21-0086

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 87

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

LUKE STROMMEN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
In and For the County of Valley, Cause No. DC 2018-32
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jason T. Holden, Katie R. Ranta, Faure Holden Attorneys at Law, P.C.,
Great Falls, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Michael P. Dougherty,
Assistant Attorney General, Helena, Montana

          Dylan Jensen, Valley County Attorney, Dan Guzynski, Special Deputy
County Attorney, Glasgow, Montana

Submitted on Briefs:  February 8, 2023

Decided:  April 30, 2024

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1     Luke Strommen appeals his January 2021 judgment of conviction in the Montana Seventeenth Judicial District Court, Valley County, on the offense of Sexual Intercourse Without Consent (SIWC). We address the following dispositive issue:

> *Whether the District Court erroneously allowed the State to present adverse expert testimony remotely via two-way video conferencing at trial?*

Reversed and remanded for new trial.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     In October 2018, the State formally charged Strommen with Sexual Abuse of Children (child pornography) based on alleged possession of digital images of then 17-year-old S.B. engaged in sexual activity. Strommen and S.B. were previously engaged in a year-long sexual relationship after meeting in 2014 while he was employed as a Valley County Deputy Sheriff. He pled not guilty and trial was set for May 2019.

¶3     In December 2018, the State filed an Amended Information charging Strommen with SIWC after then 23-year-old J.R. reported in November 2018 that she and Strommen were engaged in an ongoing sexual relationship in 2009-11. J.R. alleged that the sexual relationship began when she was babysitting Strommen's children at age 14. The relationship continued until J.R. moved away at age 16. Strommen pled not guilty under the Amended Information and trial was set on both charges for July 2019. Trial was later reset for October 2019 on Strommen's speedy trial waiver and unopposed motion for a continuance. The charges were subsequently severed for separate trials with the child

2

pornography charge maintained for trial in October 2019, and the SIWC charge set for trial in March 2020.

¶4 In September 2019, in advance of the scheduled child pornography trial, the State filed a Second Amended Information adding a third charge, Attempted Sexual Abuse of Children, an additional or alternative child pornography charge. Strommen pled not guilty, and the new charge was set for trial with the original child pornography charge in October 2019. In advance of trial, however, Strommen pled guilty to the original charge under a written plea agreement in return for dismissal of the attempted child pornography charge, and a particular State sentencing recommendation on the original charge. In February 2020, the District Court sentenced Strommen in accordance with the parties' agreed sentencing recommendation.

¶5 In advance of the SIWC trial set for March 2020, the State filed a "contingent motion" on February 21, 2020, seeking leave to present the retained expert testimony of a sexual assault behavioral psychologist (Dr. Sheri Vanino) remotely via two-way video conferencing at trial. The motion asserted that the expert testimony was necessary to aid jury understanding of the typical psychology of young sexual assault victims, and thus why they typically do not contemporaneously report sexual assault. The motion explained that Dr. Vanino: (1) lived and practiced in or about Denver, Colorado; (2) regularly conducted weekly Tuesday night therapy sessions for parents of child sexual assault victims; and (3) thus might "be unable to" travel to Montana to personally testify at the scheduled March 9th trial "due to a scheduling conflict" with her regular Tuesday night therapy sessions. The State asserted that it would be "impracticable" for Dr. Vanino to miss or

3

reschedule her March 10th therapy session due to her coordination of her counseling of child sexual assault victims and their parents. The motion asserted that the prosecutor was still "actively working" to secure her personal presence at trial, but sought "contingent" leave for her to testify remotely if necessary. At a pretrial conference on February 26, 2020, the prosecutor advised that he had since confirmed that Dr. Vanino had a definite irreconcilable scheduling conflict with her regular Tuesday night therapy sessions. The State therefore sought unqualified leave for her to testify via video conferencing remotely from Colorado.

¶6    Strommen objected. He demanded that she testify, if at all, subject to personal in-court cross-examination. He asserted that personal in-court cross-examination was particularly essential given that the alleged victim in this case did not report the alleged sexual intercourse until nine years later, thus implicating an issue as to her credibility as the primary State's witness. The prosecutor responded that "[h]aving a trial in Glasgow obviously complicate[d] travel plans" and that it was thus "not practical" for Dr. Vanino to travel to Montana for trial despite the State's "best [efforts] to get her there personally." The District Court interjected *sua sponte* that "the schedule's always going to get kinked by the weather," and thus "there's no way to guarantee" Dr. Vanino's personal presence at the scheduled March trial "given the weather situations up" in Glasgow. The Court then granted the State's motion from the bench "for all the reasons noted by the State," and the "additional reasons . . . just articulated." A corresponding written order followed on March 5, 2020. However, the scheduled March 9th trial was subsequently continued until

4

July 2020 based on an uncontested defense motion alleging newly-disclosed exculpatory evidence.

¶7 In March 2020, the Governor of the State of Montana declared a state of emergency in Montana due to the emergent Covid-19 pandemic. The Chief Justice of this Court thereafter issued the first of several Judicial Branch and courtroom administration protocols regarding the Covid-19 crisis. As pertinent here, the Judicial Branch guidelines pertained to the scheduling and conduct of jury trials, jury administration procedures, use of video and telephonic conferencing for scheduled hearings, and limitation of non-essential travel for judicial branch employees.[1] The travel guidelines applied exclusively to judicial branch employees, however, and nothing in the courtroom administration guidelines authorized remote video or teleconferencing testimony of State witnesses in criminal trials.

¶8 In May 2020, two months before the scheduled July 2020 trial, the District Court notified the parties of its *sua sponte* intent to issue Covid-19 safety guidelines for the conduct of Strommen's trial. In a subsequent May 20th order, the court issued case-specific Covid-19 protocols including restrictions on public participation, modified jury questionnaires, and granting "all witnesses" the option to testify remotely "via zoom or other available video" conferencing platform.[2]

---

[1] Subsequent directives/orders regarding Covid followed on March 17th, 20th, and 27th, April 27th, May 22nd, and December 21st, 2020; and, finally, on May 17, 2021 (https://wayback.archive-it.org/499/20230302044740//http://courts.mt.gov/).

[2] The record reflects that the court issued a similar order on May 13th, but of which, for reasons unclear, the parties were not aware until email receipt of a back-dated duplicate on June 15, 2020.

¶9     On June 1, 2020, Strommen moved for an indefinite trial postponement "until the pandemic resolves" on the asserted grounds that the District Court's blanket authorization of remote witness testimony at trial would violate his right to "face-to-face" confrontation of witnesses under U.S. Const. amend. VI and Mont. Const. art. II, § 24.  The State opposed the motion on the asserted grounds that the prosecutor had experienced no "resistance" in scheduling the personal presence of slated state witnesses, and was aware of only one possible unconfirmed exception.  The State thus asserted that it intended to have only one witness testify remotely—Dr. Vanino as previously authorized by pre-Covid court order in March 2020.  On June 15th, the District Court denied Strommen's continuance motion on the stated ground that its previously specified Covid-19 safety procedures would not infringe upon his trial rights.

¶10    At the final pretrial conference on June 24th, however, the District Court revisited the question of Dr. Vanino's remote testimony again, to wit:

> [Court]:    So Dr. Vanino's situation is specifically what?  I think *the process is going to be for any witness who requests a video appearance and testimony is to*, again, *have an offer of proof as to why*. . . .  [W]hat's the specific reason for [Dr. Vanino's] video testimony?
>
> [State]:    . . . The *specifics of Dr. Vanino's testimony is that she has a significant conflict . . . unrelated to Covid*.  She has a parent group that she does every Tuesday night.  And if she doesn't do her part, lots of children's parents—these are children that have been sexually abused.  The children's group cannot go forward. . . .  As the Court recalls, the last trial was back in March *before Covid*, and this Court issued an order . . . that allowed her to testi[fy] [remotely] . . . *unrelated to Covid*.
>
> Now since we had [the District Court's subsequent May 2020 Covid trial protocol] order, . . . I have not circled back to Dr. Vanino to ask her specifically if there's been any Covid-related circumstances that make it difficult for her to travel.  I didn't ask her that question because *the*

6

*Court had already allowed her video testimony . . . before the Covid situation surfaced. . . .* [H]er situation is *she has a significant commitment that she cannot get out of* Tuesday night that would be right in our case-in-chief that she can't miss.

And she is an out-of-state witness; she lives in Denver, Colorado—or the Denver area[] [a]nd it's s*ignificant travel for her to get to Glasgow*, Montana, as well, I think that plays into it. And the Court granted our motion back in March.

[Court]: [The March 2020 order] was *before the Covid issue arose* and . . . before the last trial . . . in March . . . [which was] under our *general protocol* . . . both with crime lab witnesses and other experts . . . to *accommodate* [*their*] *schedules*[.]

I'm *not at all excited about* bringing someone through the Denver airport, sitting on an airplane, and then bringing them up to Glasgow *under the Covid situation*. So even though I granted [the motion] . . . with[out] *the Covid overlay* I would be extremely *reluctant to withdraw that order* approving that testimony.

(Emphasis added.)

¶11 Strommen's trial began on Monday, July 13, 2020, as scheduled. Pursuant to the court's prior pre-Covid authorization in March 2020, as reaffirmed at the June 24th pretrial conference unrelated to any asserted Covid concern or justification, the State presented Dr. Vanino's remote testimony via video conferencing on Wednesday morning, July 15th.[3] Aside from her acknowledged awareness of some general case-related facts, she gave

---

[3] The State attempted to present Dr. Vanino's remote video testimony as its first witness on Tuesday morning. However, because the audio-video transmission lagged and faded-out during her direct examination, thus preventing the courtroom audience from "picking up everything she [was] saying," the State aborted and postponed her testimony until the following day in order to resolve "those technical issues." Some problem persisted the next day insofar that the State asked Dr. Vanino to "slow down" because, "even though the connection is pretty good," "it is more challenging that you are not in person to hear at times." In response to a related District Court inquiry, Dr. Vanino said "usually I can . . . see the jury," but under the remote arrangement, "I can't see the jury, which would be normal," but otherwise, "the connection is really good."

non-case-specific testimony regarding typical behaviors of child sexual assault victims regarding reporting and the criminal justice system, including the high incidence of their failure to report such incidents until much later. She also testified to the general personality traits and temperaments of sexual assault perpetrators, the dynamics of their relationships with teenage victims, why teenagers are particularly at-risk for sexual abuse, how perpetrators capitalize on their vulnerabilities/groom victims, reasons why teenage victims participate in and are complicit in concealing sexual abuse, reasons why teenage victims ultimately come forward and to whom, and the effects of memory and the passage of time on teenage victim accounts of past sexual abuse.

¶12    On defense cross-examination, the following facts came out regarding the State's previously asserted justification for Dr. Vanino's remote testimony:

> [Defense]:   [W]hen we talked on the phone [in February], you were in Denver.
>
> [Doctor]:   Correct.
>
> [Defense]:   And where are you today?
>
> [Doctor]:   I'm in Massachusetts . . . in Nantucket.
>
> [Defense]:   . . . And yesterday was a Tuesday, correct?
>
> [Doctor]:   Correct.
>
> [Defense]:   And you talked with [the prosecutor] about a *parent group counselling* that you run on *Tuesday evenings*?
>
> [Doctor]:   Yes.
>
> [Defense]:   *Did you participate in that group yesterday*?
>
> [Doctor]:   *No*, we're not able to do in-person therapy due to Covid. . . . So *those services are on pause right now*.

[Defense]: And you don't hold that group via video?

[Doctor]: No.

[Defense]: And you mentioned Covid, *are you in quarantine*?

[Doctor]: No, I'm not.

[Defense]: *So you could have been here today in person*?

[State]: *Objection*, Your Honor. The court has expressly given her permission to be [here] by video.

[Court]: The court has; *there's an order of the court, so we can proceed* to other issues, [counsel].

(Emphasis added.) During the midday recess, out of the presence of the jury, Strommen moved for a mistrial based, *inter alia*, on the conflict between the State's representations to the court regarding Dr. Vanino's inability to testify in-person due to the purported scheduling conflict in Denver and her sworn testimony that morning. The prosecutor responded:

[State]: I've had [Dr. Vanino] testify a few times. And I've always wanted her *to go before the victim* and talk about general characteristics of sexual abuse victims *prior to* the victim testifying. . . . [A]ll I've ever heard from [her] about this [is] that she has this scheduling conflict, and she will not miss it for anything, it goes on every week. When I have ever made a representation to this court, it was a mindset that she always has a Tuesday night scheduling conflict. It seems like *there may have been times* that I *could get her here* earlier in the day Monday to testify or earlier Tuesday, but it's always been this time. So when we made that representation back in March, pre-Covid, I'm quite sure she had that meeting on Tuesday night. . . . It *was our inability to get her here . . .* [t]*hat prompted our motion* because she *would not miss this Tuesday night thing* with these parents who had children who are sexually abused.

[Court]: . . . I understand but now we are in Covid . . . [a]nd she is in Nantucket.

9

[State]: Yep, and she's in Covid and she's in Nantucket. . . . I—personally, I don't think that I was really aware where I was meeting her or where she was going to come on TV. *But anyways*, I think the Court made a lot of sense, I think it was this court, . . . *do we really want to bring someone through the Denver airport with Covid*?

¶13 In denying Strommen's motion for a mistrial, the court inquired of defense counsel:

[Court]: You don't know when she went to Nantucket or how long she's been in Nantucket, right? . . . [O]r if she has family [t]here?

[Defense]: Well, it appears from my research that she has a family home there and she vacations there in July each year.

[Court]: Is it surprising to you that a lot of people who have vacation homes in Montana are beginning to spend more time in Montana? . . . During the Covid crisis, sometimes Montana vacation homes are a little more attractive to people now, particularly when they are out of large areas. Nantucket, in my estimation, is not as large as Denver. . . . There's about five million people or two million people in Denver; my guess is Nantucket is very small. So my point is, that *there's a lot of reasons that she could be there*. We didn't get into that.

[Defense]: No.

[Court]: . . . We have a huge public health crisis. . . . I'm not going to run people through however many airports it's going to take to get them here when I can do this. And historically, *before Covid*, I've done and I bet you've seen . . . a *crime lab witness on screen*. . . . I've done a lot of them, and I do a lot of them, even though I'm in Missoula, and the crime lab is in Missoula. We have got to *accommodate these folks*, and so I allowed that to be done.

I guess it's a little *surprising where she is*, but I believe that we accomplished what we needed by having a clear record made, an opportunity for you to do your examination, and not any unnecessary exposure to anyone in this courtroom with *whatever might be picked up* between Nantucket and here. So for *public safety reasons* and, frankly, *trial administration*, I think that a lot of judges in this state are *using Zoom for lots of different things*. It's *very convenient*, *not only for the witness*, *but sometimes for the attorneys*. . . . So there's a *lot of advantages to Zoom* and . . . it's a *benefit to the legal system in Montana*

*and to the jury system. . . .* And from [Dr. Vanino's] perspective she could see you and hear you and [the prosecutor] as well. . . . [I]n this particular witness, and this particular case, in this particular time, I think we're keeping everybody safe, and we're getting this trial presented in a very fair and open fashion.

(Emphasis added.)

¶14 At the close of the five-day trial, the jury found Strommen guilty of SIWC, and he was ultimately sentenced to a 40-year prison term. Strommen timely appeals.

## STANDARD OF REVIEW

¶15 Under our plenary review of lower court conclusions and applications of constitutional law, we review alleged violations of the fundamental right of the criminally accused to confront adverse witnesses under U.S. Const. amends. VI and XIV, and Mont. Const. art. II, § 24, de novo for correctness. *State v. Mercier*, 2021 MT 12, ¶¶ 11-12, 403 Mont. 34, 479 P.3d 967; *State v. Stock*, 2011 MT 131, ¶¶ 16-17, 361 Mont. 1, 256 P.3d 899; *State v. Norquay*, 2011 MT 34, ¶ 13, 359 Mont. 257, 248 P.3d 817.

## DISCUSSION

¶16 *Whether the District Court erroneously allowed the State to present adverse expert testimony remotely via two-way video conferencing at trial?*

¶17 As applied to the State through the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Sixth Amendment Confrontation Clause guarantees that the criminally "accused shall enjoy the right . . . to be confronted with [adverse] witnesses."[4] U.S. Const. amends. VI and XIV. The Sixth Amendment thus

---

[4] *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068 (1965) (Sixth Amendment Confrontation Clause applies to the States through Fourteenth Amendment Due Process Clause).

generally guarantees the criminally accused the "right to *meet*" adverse witnesses "*face to face*" at trial. *Coy v. Iowa*, 487 U.S. 1012, 1019-21, 108 S. Ct. 2798, 2802-03 (1988) (noting "irreducible literal meaning" of Confrontation Clause—citation omitted); *Maryland v. Craig*, 497 U.S. 836, 844, 110 S. Ct. 3157, 3162-63 (1990) (*Coy* "interpretation" derives from "literal text" of United States Constitution and "historical roots" thereof). The Montana Constitution similarly guarantees that the criminally "accused shall have the right . . . to meet [adverse] witnesses . . . face to face." Mont. Const. art. II, § 24. The purpose of the federal and state constitutional rights to personal, in-court face-to-face confrontation and cross-examination of adverse witnesses is to:

> ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding[,] . . . [a purpose fulfilled by] guarantee[ing] the defendant a face-to-face meeting with witnesses appearing before the trier of fact . . . [which] is the *norm of Anglo-American criminal proceedings*.

*Craig*, 497 U.S. at 844-46, 110 S. Ct. at 3162-63 (quoting *Coy*, 487 U.S. at 1016, 108 S. Ct. at 2801, *inter alia*—emphasis added). *Accord Mercier*, ¶ 16 (*citing Craig*, *supra*, and *Coy*, 487 U.S. at 1019, 108 S. Ct. at 2801 ("[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back'"—"[e]ven if a lie is told, it will often be . . . less convincing[]")).

¶18 Under the Sixth Amendment and Mont. Const. art. II, § 24, the right to confront and cross-examine adverse witnesses personally face-to-face generally applies to all "testimonial" statements offered as evidence adverse to a criminally accused at trial. *Crawford v. Washington*, 541 U.S. 36, 59 and 68-69, 124 S. Ct. 1354, 1369 and 1374 (2004). *Accord Michigan v. Bryant*, 562 U.S. 344, 357-58, 131 S. Ct. 1143, 1155 (2011).

For purposes of the Sixth Amendment and Mont. Const. art. II, § 24, a statement is "testimonial" when the "primary purpose" of the declarant's statement is to establish, report, or prove relevant factual matters to aid in the "criminal prosecution" of another. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74 (2006) (distinguishing "nontestimonial" statements, for example, as those made for the primary purpose of "enabl[ing] police assistance to meet an ongoing emergency"). *See also Ohio v. Clark*, 576 U.S. 237, 245-46 and 248-49, 135 S. Ct. 2173, 2180-82 (2015) ("primary purpose" test determines whether subject statements are "testimonial" under *Crawford*); *Crawford*, 541 U.S. at 52-61, 124 S. Ct. at 1364-70 (noting various types of constitutionally "testimonial" statements).[5]  The Sixth Amendment, and similar protection provided by Mont. Const. art. II, § 24, thus bar prosecution evidence regarding "testimonial" statements made without face-to-face confrontation except upon a showing either that (1) the declarant is "unavailable" for trial and the accused had a prior opportunity for cross-examination regarding that matter, or (2) the subject out-of-court statement not subject to face-to-face cross-examination "would have been admissible in a criminal case at the time of the founding." *Clark*, 576 U.S. at 243 and 245-46, 135 S. Ct. at 2179-80 (citing *Crawford*, 541 U.S. at 56 n.6, 124 S. Ct. at 1367 (*inter alia* noting "dying declarations" as an example

---

[5] Thus, for example, "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9, 124 S. Ct. at 1369.  *Accord Williams v. Illinois*, 567 U.S. 50, 79, 132 S. Ct. 2221, 2240 (2012) (if trial court "did not rely on the statement in question for its truth, there is simply no way around the proviso in *Crawford* that the Confrontation Clause applies only to out-of-court statements that are used to establish the truth of the matter asserted"—citing *Crawford*, 541 U.S. at 59 n.9, 124 S. Ct. at 1369, punctuation omitted).

13

of Framers-era exception to common law principle embodied in Sixth Amendment));[6] *Bryant*, 562 U.S. at 357-59 and 370, 131 S. Ct. at 1155-56 and 1162 ("basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial"— evidentiary hearsay rule standards "designed to identify some statements as reliable, will be relevant" to "the primary purpose determination" but "court must [ultimately] determine . . . [declarant's] primary purpose . . . by objective[] evaluati[on] [of] the statements and actions of the parties" under the totality of the circumstances); *Crawford*, 541 U.S. at 59 and 68-69, 124 S. Ct. at 1369 and 1374 ("*Roberts* notwithstanding[7] . . . the only indicium of reliability" of testimonial statements "sufficient to satisfy constitutional demands is the one the [Sixth Amendment] actually prescribes: confrontation"); *Ohio v. Roberts*, 448 U.S. 56, 74-75, 100 S. Ct. 2531, 2543 (1980) (state burden to show declarant unavailability under narrow circumstances when out-of-court statements not barred by

---

[6] "The Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment . . . is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding. . . . [T]he common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations." *Crawford*, 541 U.S. at 53-54, 124 S. Ct. at 1365-66.

[7] *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539 (1980) (out-of-court statements generally admissible at trial under Sixth Amendment Confrontation Clause only if government shows that declarant is "unavailable" for trial and the statements bear adequate "indicia of reliability," which may "be inferred . . . where the evidence falls within a firmly rooted hearsay exception" or "particularized guarantees of trustworthiness"—internal citation omitted), *implicitly overruled by Crawford*, 541 U.S. at 62-69, 124 S. Ct. at 1371-74.

Sixth Amendment), *implicitly overruled on other grounds by Crawford*, 541 U.S. at 62-69, 124 S. Ct. at 1371-74.

¶19 However, the United States Supreme Court, and this Court following the Sixth Amendment lead of the Supreme Court, have recognized a narrow "important public policy" exception to the face-to-face confrontation requirement when an accused is nonetheless afforded an opportunity to cross-examine the witness at trial via modern video conferencing technology. *See Craig*, 497 U.S. at 844-59, 110 S. Ct. at 3162-71 (recognizing *inter alia* that "face-to-face confrontation forms the core of the values" embedded in the Confrontation Clause but "must occasionally give way to considerations of public policy and the necessities of the case"—punctuation and citations omitted); *Mercier*, ¶¶ 15, 17-21, and 26-28 (applying *Craig* exception to two-way video conferencing under Mont. Const. art. II, § 24); *City of Missoula v. Duane*, 2015 MT 232, ¶¶ 14-16 and 20-21, 380 Mont. 290, 355 P.3d 729 (recognizing and analyzing *Craig* exception to two-way video conferencing under Mont. Const. art. II, § 24). Accordingly, the trial testimony of a prosecution witness is admissible via two-way video conferencing under the *Craig* exception upon an affirmative case-specific prosecutorial showing, and corresponding trial court findings, that (1) the witness is "unavailable" for personal face-to-face cross-examination in the courtroom, and (2) denial of such personal face-to-face cross-examination is "necessary to further an important public policy" with "the reliability of the testimony . . . otherwise assured." *Mercier*, ¶¶ 15, 17-21, and 26-28; *Duane*, ¶¶ 14-16 and 20-21; *Craig*, 497 U.S. at 847-50 and 855-59, 110 S. Ct. at 3164-66 and 3169-70. The first element of the *Craig* exception—witness unavailability—requires

15

a case-specific prosecution showing and corresponding court finding "that the personal presence of the witness is impossible or impracticable to secure due to" extraordinary distance, expense, or health "considerations." *State v. Bailey*, 2021 MT 157, ¶ 42, 404 Mont. 384, 489 P.3d 889 (quoting *Duane*, ¶ 25); *State v. Walsh*, 2023 MT 33, ¶¶ 9-11, 411 Mont. 244, 525 P.3d 343; *Mercier*, ¶¶ 19-20 and 26-28 ("face-to-face confrontation . . . may be compromised . . . only upon a case-specific finding" that it is "necessary to further an important public policy"—punctuation and citation omitted). Implicit in the required showing under the first *Craig* exception element is an affirmative showing of "a *good-faith*" prosecutorial "*effort* to obtain" the witness's "presence at trial." *See Roberts*, 448 U.S. at 74-75, 100 S. Ct. at 2543 (unavailability requirement for Sixth Amendment confrontation exception—citation omitted); *Barber v. Page*, 390 U.S. 719, 724-25, 88 S. Ct. 1318, 1322 (1968); *Norquay*, ¶¶ 21-22 (citing *State v. Hart*, 2009 MT 268, ¶ 24, 352 Mont. 92, 214 P.3d 1273 (noting similar implicit requirement of M. R. Evid. 804(a)—citing *Barber*, 390 U.S. at 724-25, 88 S. Ct. at 1322)). *See also Crawford*, 541 U.S. at 57, 124 S. Ct. at 1367-68 (citing *Barber*). The good-faith effort requirement does not require the State to make a "futile" effort, such as when a witness has died, but may require "affirmative measures" when there is a reasonable possibility, however remote, that such effort "might" secure the declarant's personal presence for trial. *Roberts*, 448 U.S. at 74-75, 100 S. Ct. at 2543. "The lengths to which the prosecution must go . . . is a question of reasonableness" under the circumstances. *Roberts*, 448 U.S. at 74-75, 100 S. Ct. at 2543 (citation omitted). The "ultimate question" is thus whether the prosecution has affirmatively shown that the witness is unavailable to personally testify at trial upon

16

reasonable "good-faith efforts undertaken prior to trial." *Roberts*, 448 U.S. at 74-75, 100 S. Ct. at 2543 (citation omitted).

¶20 Under the second *Craig* exception element, mere judicial economy or a generalized assertion, showing, or finding of significant travel burden or logistical expense or inconvenience is generally insufficient alone to constitute an important public policy justification for dispensing with actual face-to-face confrontation. *Mercier*, ¶¶ 26-28; *State v. Martell*, 2021 MT 318, ¶ 12, 406 Mont. 488, 500 P.3d 1233 (citing *Mercier* and *Bailey*); *Bailey*, ¶ 42 (showing that witness not reasonably available for trial "does not obviate" prosecutorial burden to further show "that dispensing with" personal in-court confrontation and cross-examination is "necessary to further an important public policy"). Even then, the second *Craig* exception element still requires "the hallmarks of confrontation": (1) the witness "must be under oath and understand the seriousness of his or her testimony"; (2) the witness must be "subject to cross-examination"; and (3) the remote audio-video technology platform must be of sufficient means and quality to allow meaningful "assessment of the witness's veracity by the factfinder." *Mercier*, ¶¶ 17 and 21 (citing *Duane*, ¶ 15, and *Craig*, 497 U.S. at 857, 110 S. Ct. at 3170, *inter alia*). *See also Crawford*, 541 U.S. at 59 and 68-69, 124 S. Ct. at 1369 and 1374 ("the only indicium of reliability" of testimonial statements "sufficient to satisfy constitutional demands is" as "actually prescribe[d]" by the Sixth Amendment).

¶21 We have carefully guarded the Sixth Amendment and Mont. Const. art. II, § 24, rights of an accused to physical face-to-face confrontation at trial by holding the State and trial courts to their respective burdens under the *Craig* exception. *See, e.g., Walsh*, ¶¶ 5

17

and 9-11 (affirming allowance of remote video testimony of prosecution expert on "substantive[] detailed findings about the health and logistical challenges involved in attempting to bring" the witness "from Greece" due to 11,000-mile trip, 30-hour flight time, "significant time in airports . . . for multiple layovers," logistical difficulties imposed by Covid-19 pandemic protocols, and heightened risk of Covid-19 contraction and spreading health risks to witness, court personnel, and other witnesses posed by disregard of national warnings to avoid air travel to and from Greece); *Duane*, ¶¶ 6, 21, and 25 (affirming allowance of remote video testimony of prosecution expert upon "compelling showing" and court finding that "extraordinary [city] expense" and "significant [witness] burden" made bringing veterinarian witness from California for "three separate [misdemeanor] trials" regarding the same subject matter "impossible or impracticable"). *See also Mercier*, ¶ 20 (emphasizing unique factual circumstances at issue in *Duane*). We have thus rejected lesser showings, assertions, and findings in order to protect the fundamental Montana and U.S. constitutional right to personal face-to-face courtroom cross-examination from diminution in the face of ever-advancing video conferencing technology. *See, e.g.*, *Martell*, ¶¶ 3, 13, 15, and 27 (state assertion that requiring witness to travel from Washington for "only a few minutes [of] testimony" would be "overly burdensome" and "unnecessarily expensive" insufficient to justify non-harmless denial of defendant's right to face-to-face confrontation); *Bailey*, ¶¶ 11, 43-45, and 49 (allowance of remote video testimony of State Crime Lab toxicologist not harmless error where only asserted justification was that "requiring" full-day "travel [to and] from Missoula to Helena for brief testimony would be impracticable due to distance, expense, and timing"—"vague

18

and unverified claims of the burden" imposed upon state or witness insufficient for denial of defendant's right to physical face-to-face confrontation at trial); *Mercier*, ¶¶ 6, 19-20, and 26-28 (rejecting state assertion that "pursuant to the public policy of judicial economy[] it was unreasonable to incur significant travel expenses and inconveniences" of requiring federal agent to travel from Colorado for what the state "deemed" as "purely foundational" testimony regarding his forensic cell phone data extraction analysis and report findings).

¶22 On appeal, the State now relies solely on its assertion that Dr. Vanino's remote video testimony was justified in furtherance of "public health" and to protect courtroom staff and trial participants from the risk of Covid-19 exposure. The problem is, however, the State made no such assertion on any of the multiple occasions on which the issue arose below, whether in support of its "contingent" February 21st motion, at the pre-Covid pretrial conference on February 26th, the post-Covid pretrial conference on June 24th, or even in opposition to Strommen's mid-trial motion for mistrial. Rather, the State consistently asserted below that Dr. Vanino's remote video testimony was necessary due to an irreconcilable scheduling conflict with her regularly scheduled Tuesday night private practice therapy session in Denver. Even to that extent, the State asserted no particularized reason, much less made an affirmative showing, as to why or on what basis it was impossible or impractical for Dr. Vanino to alternatively reschedule her regularly scheduled Tuesday night therapy session, conduct it by remote video conferencing from Montana, or immediately fly to Montana thereafter to testify at some other time during the

19

multi-day trial.[8] Nor did the State seek leave to earlier depose her in Montana subject to personal face-to-face cross-examination at another available time.[9] In response to Strommen's objection, the State generally asserted only that "having a trial in Glasgow obviously complicated travel plans," and it was "not practical" for her to travel to Montana for trial despite the State's "best" efforts "to get her there personally." The District Court thus initially granted the State's motion and allowed Dr. Vanino to testify remotely "for all the reasons [asserted] by the State" and because there was "no way to guarantee"

---

[8] The record manifests that trial started with jury selection on a Monday morning, and evidence did not close until late Thursday.

[9] *See* § 46-15-201, MCA (authorizing pretrial material witness deposition on leave of court on showing of witness unavailability for trial and necessity "to prevent a failure of justice"); *Norquay*, ¶¶ 15-28 (pretrial video deposition testimony of prosecution DNA expert under § 46-15-201, MCA, upon showing of medical unavailability for trial admissible at trial without Confrontation Clause violation where face-to-face confrontation and cross-examination afforded and video recording afforded jury "opportunity to view the demeanor of the witness and [thereby] evaluate her credibility"); *Hart*, ¶¶ 18-20 and 23-26 (pretrial video deposition testimony of uncooperative witness admissible at trial without Confrontation Clause violation where witness fled jurisdiction to avoid trial subpoena, later arrested out-of-state on material witness warrant under § 46-15-201, MCA, subsequently deposed in Montana subject to face-to-face cross-examination, and disobeyed subpoena for subsequent trial); *Tooker v. State*, 147 Mont. 207, 219-20, 410 P.2d 923, 929-30 (1966) (noting Confrontation Clause conformance of criminal deposition procedure authorized by 1889 Mont Const. art. III, §§ 16 and 17—citing *Diaz v. United States*, 223 U.S. 442, 32 S. Ct. 250 (1912), *Motes v. United States*, 178 U.S. 458, 472, 20 S. Ct. 993, 998 (1900), and *Grove v. United States*, 3 F.2d 965 (4th Cir. 1925)); *California v. Green*, 399 U.S. 149, 165, 90 S. Ct. 1930, 1938-39 (1970) (Confrontation Clause conformance of subsequent trial admission of prior "preliminary hearing testimony" of no-longer-available prosecution witness because already subject to face-to-face cross-examination under "circumstances closely approximating" personal in-court testimony at trial); *Mattox v. United States*, 156 U.S. 237, 240-44, 15 S. Ct. 337, 338-40 (1895) ("primary object of" Confrontation Clause—to afford accused "personal examination and cross-examination" and "compel[]" adverse witness to "*stand face to face with the jury*" for witness demeanor and credibility assessment—"must occasionally give way to considerations of public policy and the necessities of the case" to allow admission on retrial of transcript of original trial testimony of since-deceased prosecution witnesses—emphasis added).

20

Dr. Vanino's personal presence "given the weather situations" in the Glasgow area in March.

¶23 Nor did the State or District Court assert or rely on any Covid-based concern regarding Dr. Vanino in the State's opposition to and the court's resulting June 15, 2020, denial of Strommen's confrontation-based motion for an indefinite trial continuance in response to the court's post-Covid grant of a blanket remote testimony option to all witnesses. The State opposed, and the District Court denied, Strommen's motion on the stated grounds that Dr. Vanino's remote testimony was previously authorized on independent pre-Covid grounds, and that the State anticipated no Covid-related need for remote testimony from any other witness. Even when questioned again by the District Court at the June 24th pretrial conference less than a month before the July 2020 trial, the State relied exclusively on its originally-asserted pre-Covid justification that Dr. Vanino had a "*significant conflict . . . unrelated to Covid*," and that the court previously authorized her remote testimony on that ground. The District Court then exclusively stood on its independent pre-Covid authorization, to wit:

> [though] I'm *not at all excited about* bringing someone . . . up to Glasgow under the Covid situation . . . I would be extremely *reluctant to withdraw* [my pre-Covid] *order* approving that testimony.

(Emphasis added.)

¶24 Eliminating any doubt, even in opposition to Strommen's after-the-fact motion for mistrial, the State still relied on its original non-Covid-related justification for Dr. Vanino's remote video testimony. Only as an afterthought did the prosecutor opportunistically question rhetorically, "[*b*]ut anyways . . . do we really want to bring someone through the

21

Denver airport with Covid?" (Emphasis added.) Belying that opportunistic rhetoric, however, was the prosecutor's concomitant disclosure that the *primary State concern all along* was its *tactical trial preference* for "want[ing]" Dr. Vanino to testify immediately "before the victim" so she could "talk [in advance] about [the] general characteristics of sexual abuse victims prior to the victim testifying." But for that tactical preference, the prosecutor acknowledged that "there may have been times that [he] could get her [to Montana to testify for other trials] earlier in the day Monday . . . or earlier Tuesday."[10] Similarly, despite some only generally stated after-the-fact equivocation regarding witness travel during the Covid scare, the District Court's stated rationale for denying Strommen's after-the-fact mistrial motion clearly manifests that the primary court justification for allowing Dr. Vanino's remote testimony was not Covid-related, but rather, its general practice of accommodating expert witness convenience, to wit:

> [H]istorically, *before Covid*, I've done [that with] . . . *crime lab witness*[*es*]. . . . I've done a lot of them . . . even though I'm in Missoula, and the crime lab is in Missoula. We have *got to accommodate these folks*, and *so I allowed that* to be done.

> I guess it's a little surprising where [Dr. Vanino] is, but . . . we accomplished . . . [defense] [cross-]examination [without] any unnecessary exposure to anyone in this courtroom with whatever might be picked up between Nantucket and here. So for public safety reasons and, frankly, *trial administration*, I think that a lot of judges in this state are *using Zoom for lots of different things*. It's *very convenient*, *not only for the witness*, but *sometimes for the attorneys*. . . . So there's a *lot of advantages to Zoom* and . . . it's a b*enefit to the legal system in Montana and to the jury system*.

---

[10] *Compare* M. R. Evid. 611(a) (broad trial court discretion to reasonably administer and "control . . . [the] order of interrogating witnesses" in furtherance of "the ascertainment of the truth," *inter alia*).

(Emphasis added.)

¶25    In contrast to the qualifying justifications shown in *Walsh* and *Duane*, *supra*, and similar to the inadequate justifications asserted in *Martell*, *Bailey*, and *Mercier*, *supra*, the State failed to make an adequate case-specific showing, and the District Court failed to make an adequate case-specific finding, that it would have been impossible or reasonably impracticable for the State to secure Dr. Vanino's testimony, or similar testimony from another qualified expert, for personal in-court presentation at the originally scheduled March 2020 trial due to an important public policy sufficiently weighty to overcome Strommen's federal and state constitutional rights to personal in-court cross-examination of prosecution witnesses.  Nor did the State or District Court respectively make any such particularized case-specific showing or finding even in the ensuing midst of the burgeoning Covid-19 crisis.  To the contrary, even after March 2020 and prior to the rescheduled July 2020 trial, the State and the District Court continued to stand on the State's asserted pre-Covid scheduling conflict, as later revealed to be no more than a tactical witness scheduling preference, and the consistently stated District Court concern regarding prosecution expert witness convenience, as the primary pretrial justifications for Dr. Vanino's remote testimony.   Neither the prosecutor's opportunistic rhetorical afterthought referencing the Covid health scare in opposition to Strommen's mistrial motion in the wake of the startling discovery of facts undermining the State's previously asserted justification, nor the District Court's partial after-the-fact equivocation, altered the clear and unambiguous record manifestation of the non-Covid-related justifications exclusively relied on respectively by both prior to the July 2020 trial.  Even those respective

23

after-the-fact equivocations of the prosecutor and court were belied by their respective concomitantly stated primary justifications on the mistrial motion record—the State's tactical witness order preference and the Court's accommodation of prosecution expert convenience. The respective after-the-fact equivocations of the prosecutor and court were further belied, moreover, by the facts that: (1) Dr. Vanino was no longer conducting the Tuesday night therapy sessions put forth by the State as justification for why she could not travel to Montana for trial; (2) she had instead, albeit to the surprise of the prosecutor and court, traveled cross-country from Denver to Massachusetts in the midst of the Covid crisis for reasons unknown;[11] and (3) neither the State nor the court expressed any pretrial concern regarding any Covid-related health risk posed by requiring the other slated in-state and out-of-state prosecution witnesses and trial participants to travel to and from Glasgow for trial in the midst of the Covid scare.[12]

¶26    The record clearly manifests that the asserted State justification for Dr. Vanino's remote video testimony was based exclusively on trial tactics and witness convenience considerations inherently attendant with most relatively complex criminal trials, particularly when the State has a *tactical preference* for an out-of-state expert to provide

_____

[11] Pursuant to the State's immediate objection, the District Court precluded defense counsel from asking Dr. Vanino the reason why she was testifying remotely from her second home in Nantucket, Massachusetts, rather than her place of primary residence and practice in Denver, Colorado, whether due to personal recreational or Covid-risk reasons. The court later cited that mystery in rejecting Strommen's arguments in support of his mistrial motion.

[12] State's witnesses required to travel to Glasgow for trial included the alleged victim J.R. (Washington state), Janet Rodgers (Minnesota), Agent McDermott (Great Falls), and Kelsey Remus (Hamilton). Also required to travel were the judge (Missoula), court reporter (Bozeman), prosecutor (Helena), and defense counsel (Great Falls).

non-case-specific testimony bolstering other prosecution witness testimony and evidence. The resulting District Court justifications were then based in part on the State's insufficient justifications, and the court's own *sua sponte* interjection of expert witness convenience considerations and only generalized Covid-19 concerns. Thus, in stark contrast to the qualifying justifications shown and found in *Walsh* and *Duane*, and similar to the patently insufficient justifications asserted in *Martell*, *Bailey*, and *Mercier*, the grounds asserted by the State and found by the District Court here were simply insufficient to satisfy the requirements recognized in *Mercier*, *Duane*, *Crawford*, and *Craig* as justifications for denying Strommen his fundamental constitutional right to face-to-face cross-examination of all adverse witnesses under the Sixth Amendment and Mont. Const. art. II, § 24.

¶27 In tacit recognition of its tenuous primary position on appeal, the State alternatively asserts that: (1) Dr. Vanino's testimony was not constitutionally "testimonial" as required to trigger Strommen's right to in-court face-to-face confrontation; (2) that it was in any event "impracticable" for the State to require her personal appearance because the burden on her and/or the State substantially outweighed the evidentiary import to the State's case of her only secondary "opinion witness" testimony; and (3) the allowance of Dr. Vanino's remote video testimony was in any event harmless error. However, the State's assertion, for the first time on appeal, that Dr. Vanino's contemplated testimony was non-essential or of little import to the State's case is strikingly inconsistent with its assertions below. As manifest in its stated opposition to Strommen's repeated objections, the State clearly viewed Dr. Vanino's contemplated testimony to be highly important to bolster the credibility of the central prosecution witness here by providing a behavioral science

25

explanation to aid the jury in understanding her failure to earlier-disclose the sexual misconduct allegedly inflicted upon her by Strommen.  Contrary to its assertion on appeal, the State's posture below thus manifests that it viewed Dr. Vanino's only secondary "opinion witness" testimony to be of such importance to justify depriving Strommen of the right to personally confront and cross-examine her in the presence of the jury.

¶28     The Sixth Amendment Confrontation Clause, like Mont. Const. art. II, § 24, "contemplates [only] *two classes of witnesses*—those *against* the defendant and those *in . . . favor*" of the defendant.  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14, 129 S. Ct. 2527, 2533-34 (2009).  Contrary to the State's assertion, there is no "third category of witnesses" under the Confrontation Clause, and Mont. Const. art. II, § 24, for State's witnesses that are "helpful to the prosecution, but somehow immune from confrontation."  *Melendez-Diaz*, 557 U.S. at 313-14, 129 S. Ct. at 2533-34 (rejecting state assertion that authors of "testimonial" lab reports offered as proof of the matters asserted were "not subject to confrontation because they [were] not 'accusatory' witnesses, in that they [did] not directly accuse [defendant] of wrongdoing").  *Accord Mercier*, ¶ 27 ("nowhere in the text of the Confrontation Clause is there language limiting the type of testimonial evidence to which the right to physical confrontation applies"—citing *Clark*, ¶ 22 (neither the nature of the witness nor the evidence which may be entered based upon the witness's testimony impacts the right to confront the witness)); *Williams v. Illinois*, 567 U.S. 50, 116-17, 132 S. Ct. 2221, 2263 (2012) (Thomas, J., concurring) (a "distinction between those who make 'inherently inculpatory' statements and those who make other statements that are merely 'helpful to the prosecution' has no foundation in the text of the

26

[Sixth] Amendment," is "contrary to history," and "also makes little sense" because "[a] statement that is not facially inculpatory may turn out to be highly probative of a defendant's guilt when considered with other evidence"—citing *Melendez-Diaz*). *See also Martell*, ¶ 15; *Bailey*, ¶ 45. Here, Dr. Vanino was unquestionably a prosecution witness "adverse" to Strommen for purposes of the Sixth Amendment Confrontation Clause and similar protection guaranteed by Mont. Const. art. II, § 24. The primary and intended purpose of her testimony was to aid the State in the prosecution of Strommen at trial by providing not only a behavioral science basis to aid the jury in favorably assessing the credibility of the central prosecution witness, but as additional expert testimony regarding the typical psychology and practices of child sex abusers in support of the State's other evidence against him. Dr. Vanino's testimony was unquestionably "testimonial" evidence as defined in *Clark*, 576 U.S. at 245-46 and 248-49, 135 S. Ct. at 2180-81, and *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273-74, and therefore subject to face-to-face confrontation as guaranteed by the Sixth Amendment and Mont. Const. art. II, § 24. We hold that allowance of Dr. Vanino's remote video testimony violated Strommen's fundamental Sixth Amendment and Mont. Const. art. II, § 24, right to personal face-to-face confrontation of adverse prosecution witnesses in the courtroom at trial.

¶29 Structural error "is typically of constitutional dimensions" and "undermines the fairness of the entire trial proceeding." *State v. Van Kirk*, 2001 MT 184, ¶¶ 38-39, 306 Mont. 215, 32 P.3d 735. Structural error is thus "presumptively prejudicial and . . . reversible." *Van Kirk*, ¶¶ 38-39. Other types of trial errors that do not undermine the fundamental fairness of the entire trial process are non-structural, and thus subject to

27

comparative "qualitative assessment" of the "prejudicial impact" of the error in relation to the untainted trial evidence. *Van Kirk*, ¶ 40. Non-structural trial error is thus harmless "only if there is no reasonable probability that the erroneously admitted evidence contributed to the conviction." *Van Kirk*, ¶ 46. If other untainted evidence compellingly proved the same fact as the tainted evidence, evidentiary error may often be harmless if there is no reasonable probability that the tainted evidence influenced jury assessment of the untainted evidence. *See Van Kirk*, ¶ 47. While we have not recognized any bright-line rule, we have typically viewed denial or infringement of the Sixth Amendment and Mont. Const. art. II, § 24, right to face-to-face cross-examination of adverse witnesses as non-structural trial error. *See, e.g.*, *Mercier*, ¶ 31 (supporting federal citations omitted); *Bailey*, ¶ 46 (citing *Mercier*); *Martell*, ¶ 17 (citing *Bailey* (citing *Mercier*)); *Coy*, 487 U.S. at 1021-22, 108 S. Ct. at 2803 (recognizing that "other types of violations of the Confrontation Clause are subject" to "harmless-error analysis" and there is no apparent "reason why denial of face-to-face confrontation should not be treated the same").

¶30     However, "depending upon the circumstances," even properly admitted expert opinion testimony is often "highly prejudicial," though nonetheless admissible under M. R. Evid. 401-03 and 702-03, due to "the nature of expert testimony as authoritative opinion given by a recognized expert in a specialized field of expertise beyond the common knowledge and experience of lay jurors." *State v. Mills*, 2018 MT 254, ¶ 41, 393 Mont. 121, 428 P.3d 834 (citation omitted). The obvious reason why is the tendency of people who do not have expertise in a relevant field of specialized knowledge to rely on a seemingly authoritative opinion of a qualified and credible person who does. Here, as

28

noted *supra*, the intended purpose of Dr. Vanino's expert testimony was to aid the State in the prosecution of Strommen at trial by providing not only a behavioral science basis to aid the jury in favorably assessing the credibility of the central prosecution witness, but additional expert testimony regarding the typical psychology and practices of child sex abusers to support its other evidence against him. Contrary to the State's assertion on appeal, Dr. Vanino's testimony was highly relevant evidence against Strommen which the State manifestly viewed, at least below, to be essential to his successful prosecution in a classic he-said/she-said sex offense case. The State's assertion of harmless error on appeal is thus squarely contradicted by the record and its own conduct below. Under these circumstances, the patently erroneous allowance of Dr. Vanino's remote testimony in violation of Strommen's federal and state constitutional right to personal face-to-face confrontation and cross-examination of adverse witnesses at trial was not harmless under our demanding *Van Kirk* standard for harmless error.

## CONCLUSION

¶31 We hold that, under the particular circumstances here, the denial of Strommen's right to personal in-court face-to-face confrontation of Dr. Vanino was reversible error in violation of the Sixth Amendment Confrontation Clause and similar protection guaranteed by Mont. Const. art. II, § 24. Strommen's July 2020 SIWC conviction is therefore hereby reversed and remanded for new trial.

/S/ DIRK M. SANDEFUR

29

We concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON

Justice Jim Rice did not participate in the decision of this Opinion.

Justice Beth Baker, dissenting.

¶32   I disagree with the Court's conclusion that Strommen's confrontation rights were violated when the District Court permitted Shari Vanino to testify at trial by two-way video communication. Strommen raises several additional issues, none of which in my view amount to reversible error. I accordingly would affirm his conviction and therefore dissent from the Court's decision to the contrary.

¶33   Under the two-prong *Craig* standard, for a court to allow an alternative to the physical courtroom presence of a witness, there must be a case-specific finding that "denial of physical face-to-face confrontation is necessary to further an important public policy." *Mercier*, ¶ 18. In addition, and not challenged here, "the reliability of the testimony must be maintained by such hallmarks as the witness being placed under oath, testifying in the view of the jury, and being subject to cross-examination." *Walsh*, ¶ 10 (citing *Craig*, 497 U.S. at 846-47, 110 S. Ct. at 3164).

¶34   Reducing the spread of COVID-19 is a compelling policy interest. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. ___, ___, 141 S. Ct. 63, 67 (2020) (per curiam); *see also Stand Up Mont. v. Missoula Cty. Pub. Sch.*, 2022 MT 153, ¶ 20, 409 Mont. 330,

30

514 P.3d 1062. We have found a court's focus on COVID-19-related public health concerns, including official governmental advisories against travel, to be an important public policy justification under the *Craig* standard for using technology to present a witness's testimony. *Walsh*, ¶ 11. We upheld a remote appearance in *Walsh*, observing that a witness's long-distance travel during the height of the pandemic "could well have placed herself, the court, the other witnesses, and the defendant into a heightened risk of contracting COVID-19." *Walsh*, ¶ 11. And we recently reaffirmed, "[n]o credible claim can be made that protection of public health—including the protection of jurors, witnesses, litigants, and court personnel—is not an important public policy." *State v. Mountain Chief*, 2023 MT 147, ¶ 30, 413 Mont. 131, 533 P.3d 663.

¶35 Were it not for COVID-19, the Court's analysis here would be correct. In my view, however, the Opinion focuses too much on the State's assertions in the trial court and not on the District Court's decision. What is at issue is whether the court's ruling was justified by a strong public policy interest—that the personal presence of the witness is impracticable to secure due to such things as extraordinary health considerations. This trial occurred in July 2020, during the worst of the pandemic when there were many unknowns and vaccines were not available. During this time, the State of Montana was under a public health emergency. Executive Order No. 2-2020 specifically provided that "proactively implementing mitigation measures to slow the spread of the virus is in the best interests of the State of Montana and its people[.]" Executive Order Declaring a State of Emergency to Exist Within the State of Montana Related to the Communicable Disease COVID-19 Novel Coronavirus, Exec. Order No. 2-2020, 1 (Mar. 12, 2020)

31

(https://perma.cc/57KB-SY3E). This Court likewise had taken measures to respond to the public health emergency, instructing courts that, "[w]hile we must maintain our core constitutional services, we are obligated to care for the health and safety of our employees and the public we serve." Memorandum from Mike McGrath, Chief Justice, Montana Supreme Court, to Montana District Court Judges et al., (March 17, 2020) (https://perma.cc/59S2-DWXE).

¶36 A review of the record reveals that the District Court went to great lengths to follow recommended protocols and to keep all trial participants safe. On May 13, 2020, the court issued an Order Regarding Trial setting forth a number of specific provisions to accommodate COVID-19 restrictions. The order directed a courtroom site survey by the Valley County Department of Health and the Clerk of Court to determine how COVID-19 public health restrictions would allow for jury selection to be conducted, given social-distancing requirements; required a case-specific jury questionnaire to be sent out to cut down on voir dire and minimize contact with the potential jury panel; and directed that out-of-state witnesses could testify via video or Zoom.[1] The court followed with another order a week later, adding a directive that all court personnel, "including the Clerk, Court Reporter, Witnesses, Counsel and the Court will be required to wear personal protective equipment (PPE) at all times in the courtroom and chambers[;]" reiterating that witnesses, including the victim, would be given the option to testify via Zoom or other available video;

---

[1] The District Court later alluded to Montana's requirement that out-of-state visitors to Montana must quarantine for two weeks. *See* Directive Implementing Executive Orders 2-2020 and 3-2020 and Providing Mandatory Quarantine for Certain Travelers Arriving in Montana from Another State or Country, 2 (Mar. 30, 2020) (https://perma.cc/Q89Q-P5RT).

and precluding the attendance of observers in the Valley County Courtroom, noting that there would be a video feed at an alternate location.

¶37    Strommen responded to these orders by moving to continue the trial until all witnesses safely could appear in person, arguing that his right to confront witnesses in person justified the continuance.  The District Court's order denying that motion recounted that the trial had been continued four times already—each time on the Defendant's motion—and cited our decision in *Duane* to support its conclusion that two-way video testimony would not violate Strommen's confrontation rights.[2]  The court noted that it "is not prohibiting witnesses from testifying in person" but leaving it "up to the witness to determine if they have COVID-19 related symptoms," commenting that the virus "is the most pressing public health threat to confront the courts in over 100 years."  The court explained:

> COVID-19 is a new disease and there is limited information regarding risk factors for severe disease.  Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19. . . .  If the witness is a person who fits the criteria for being "high-risk for severe illness from COVID-19," the CDC recommends that person stay home.  Additionally, the CDC notes that if your household includes one or more vulnerable individuals, then all household members should act as if they, themselves, are at higher risk.
>
> .   .   .
>
> The COVID-19 pandemic is a unique event which poses a unique set of challenges requiring extraordinary measures to protect the health and safety of the public, witnesses, court staff, and the Court itself.  The Court is not closing the proceeding, but instead prohibiting the public's physical presence

---

[2] We had not decided *Mercier* at the time of the District Court's order.

during jury selection and providing a video feed at an alternate location to allow the public to view the proceedings in real time.

The order concluded:

> It is the Court's position that the trial procedures adopted to the unique circumstances faced in the COVID pandemic protect the Defendant's Sixth Amendment right to face [his] accusers, his right to a public trial, and his right to be present at all critical stages of the trial, as well as the public's First Amendment right to observe the trial. The modified procedures protect the Court, court staff, the public and parties from risks posed by the pandemic. The Court reserves the right to adjust procedure as circumstances warrant.

¶38 When the issue of Vanino's remote testimony again arose during the June 24, 2020 pretrial hearing, the District Court observed that its pre-COVID-19 order had been made "under general protocol" the court had followed in other cases. The court then explained that it would not reconsider its decision given the current circumstances:

> I'm not at all excited about bringing someone through the Denver airport, sitting on an airplane, and then bringing them up to Glasgow under the [COVID] situation. So even though I granted it under the usual practice of this Court, and I think many others, with the [COVID] overlay I would be extremely reluctant to withdraw that order approving that testimony.

The court went on to detail all the other protocols it had put into place to meet the moment and ensure, to the greatest extent possible, public health and the safety of all those who would be participating in the trial, while protecting the Defendant's constitutional rights to a fair and public trial and confrontation of witnesses.

¶39 Though other witnesses may not have chosen the District Court's allowed option to appear remotely, that does not undermine the reasons for not bringing an out-of-state witness across the country. That Vanino was in Nantucket also does not seem particularly relevant; first, many people were finding more remote places to isolate and choosing

34

vacation homes if they had them; and second, the issue is not whether the State advised the court of Vanino's actual location but whether her remote appearance violated Strommen's constitutional rights in light of the public policy justifications for not requiring witnesses to travel from out-of-state. Whether she would be coming from Denver or Boston is not material. Permitting her testimony by two-way video served the important public policy of protecting public health by preventing the spread of COVID-19. At the time the court made its final order on the matter, it appropriately was concerned primarily with lessening the risk of infection among the trial participants.

¶40 The trial court heeded its "obligat[ion] to care for the health and safety of our employees and the public we serve." Memorandum from Mike McGrath, Chief Justice, Montana Supreme Court, to Montana District Court Judges et al. (Mar. 17, 2020). Under the precedent we have established, COVID-19 concerns presented an important public policy justification for permitting Vanino's remote appearance at trial. *See Walsh*, ¶ 12; *Stand Up Mont.*, ¶ 20; *Mountain Chief*, ¶ 30. Strommen has not alleged that *Craig*'s reliability factor was not met, and I would conclude that he has failed to show a deprivation of his constitutional rights.

¶41 Strommen raises several additional challenges to his conviction, including that Vanino improperly testified to statistical conclusions; that the District Court erred by denying his request to depose a potential witness who could have undermined the victim's credibility; and that the prosecutor committed misconduct by discussing facts that had been precluded by an order in limine and by commenting on Strommen's silence. Finding reversible error on the confrontation issue, the Court does not reach these arguments. I

35

therefore need not discuss them for purposes of this Dissent, but I would conclude that Strommen has not shown any reversible error. I would affirm his conviction.

/S/ BETH BAKER

Chief Justice Mike McGrath joins in the dissenting Opinion of Justice Baker.

/S/ MIKE McGRATH